NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 99

No. 2015-430

In re LaBerge NOV                                        Supreme Court

                                                         On Appeal from
                                                         Superior Court,
                                                         Environmental Division

                                                         April Term, 2016


Thomas S. Durkin, J.

Brian P. Hehir, Burlington, for Appellants Matthew and Judy LaBerge.

E.M. Allen of Stetler, Allen & Kampmann, Burlington, for Appellee Town of Hinesburg.

Claudine C. Safar of Monaghan Safar Ducham PLLC, Burlington, for Appellees Gary and Fiona
  Fenwick.


PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.     **ROBINSON, J.** The LaBerges appeal the Environmental Division's affirmance of a Notice of Violation (NOV) issued by the Town of Hinesburg Zoning Administrator (ZA) for violation of a Town noise ordinance arising from use of a motocross track on their property.  On appeal, the LaBerges assert that the ordinance is unconstitutionally vague and that the Environmental Division's conclusion that the LaBerges violated the ordinance is clearly erroneous.  We affirm.

¶ 2.     After a trial and site visit, the Environmental Division made the following findings. The LaBerges and the Fenwicks own and live on adjoining parcels of land in the Town

of Hinesburg. The LaBerges maintain a motocross track on their property, and the track is situated near the parties' shared boundary line. The properties are located in a rural section of town where properties are mostly wooded, except for the areas surrounding their home.

¶ 3. On July 22, 2013, the Zoning Administrator (ZA) visited the area at the Fenwicks' request and observed motocross motorcycles being ridden on the LaBerge property. At the time, the ZA and the Fenwicks stood on the Fenwicks' land near the common boundary line with the LaBerge property. The ZA and one of the Fenwicks measured the sound emitted from the motorcycles using a sound meter purchased by the Fenwicks. For a period in excess of an hour, the noise levels exceeded 80 dBA for a period of ten to fifteen seconds every five minutes, during times when the motorcycles were closest to the common boundary line. Although the ZA personally observed the motorcycle noises only on July 22, 2013, during conversations that day, Mr. LaBerge confirmed that his two sons had also ridden their motorcycles with similar noise levels and for similar duration on June 3 and July 7.

¶ 4. The Fenwicks hired a noise expert, who installed noise meters on their property. That expert confirmed, based on his testing, that the motorcycles on the Laberge track resulted in noise at the Fenwick's property in excess of 80 dBA. The trial court credited the expert's testimony that in industrial settings where noise levels exceed 80 dBA, all workers are required to use ear protection.

¶ 5. The Laberges' sons ride motorcycles regularly on their motocross track, although the frequency has diminished over the last seven years, as their sons are not competing in motocross as much as they once did. Six years earlier, in 2007, the ZA issued and the Development Review Board (DRB) upheld a NOV to the LaBerges for violating the Town's prior noise-related performance standards due to motorcycle use. The LaBerges did not appeal that violation, and they have not received any other Notice of Violation since that time.

¶ 6. The vast majority of property owners in Town do not operate motorcycles or ATVs on their residential property, and the ZA has not received any other noise complaints concerning motocross bikes or ATVs ridden on any other residential property in Town.

¶ 7. The Town has a noise ordinance that states: "Unreasonable noises are not permitted. A determination of 'unreasonable' shall include factors such as intensity, duration, and frequency (i.e., how often it occurs)." The ordinance exempts "usual and customary residential activities or property maintenance."

¶ 8. Based upon his visit on July 22, 2013, and the reports of two other recent instances in which the Laberges' sons rode for similar durations and generated similar levels of noise, the ZA issued an NOV to the Laberges. In his notice to the Laberges, the ZA lamented that the noise ordinance "contain[ed] no guidelines on what a reasonable duration or frequency might be," and said, as a consequence, "I recognize that my application of the regulations is arbitrary."

¶ 9. The LaBerges timely appealed the ZA's NOV to the DRB. After a hearing, the DRB found that: (1) the LaBerges' motorcycle use constituted a "usual and customary residential activity"; and (2) the noise emitted from the use of the motocross track was intense, but in light of its limited frequency and duration, it was not unreasonable. The Fenwicks appealed to the Environmental Division of the Superior Court.

¶ 10. The Fenwicks' statement of questions to the Environmental Division identified three questions. First, does the dirt biking and/or motocross use of the LaBerges' property violate Section 5.12, specifically 5.12.1, of the Town's regulations? Second, does the LaBerges' dirt biking and/or motocross use of their property constitute unreasonable noise as defined in the regulations? Finally, does the LaBerges' dirt biking and/or motocross use of their property constitute a usual and customary residential activity, particularly in light of the Environmental

3

Division's decision in In re Fowler, No. 159-10-11 Vtec (Vt. Super Ct. Envtl. Div. Feb. 4, 2013) (Durkin, J.)?

¶ 11.   The Environmental Division addressed each in turn.  With respect to the first two questions, the court rejected the LaBerges' argument that the ordinance was unconstitutionally vague, concluding that it was not standardless, and that it struck a reasonable balance between notice to the landowner and flexibility for the municipality.  The court further held that the noise level from the motocross track for ten to fifteen seconds every five minutes for up to two hours at a time was excessive, especially for a residential setting, considering such noise level often warrants hearing protection in a more industrial setting.  It noted that 80 dBA was 10 dBA higher than—or twice as loud as—the highest specific decibel limit the court had seen in any Vermont zoning regulation.  Regarding the third question, the court concluded that dirt biking and motocross riding are not so customary and incidental to residential use that they can escape the limits of a noise ordinance specifically designed to regulate the competing claims of neighbors. The court noted the absence of any evidence that the repeated riding of motocross motorcycles was a usual and customary practice in Town.  Accordingly, the court affirmed the NOV.

¶ 12.   On appeal to this Court, the LaBerges make two overarching arguments.  First, they contend that Section 5.12.1 of the Hinesburg Zoning Regulations is so vague and lacking in notice that it violates due process and equal protection.  Second, they argue that the court's conclusion that the limited, sporadic, seasonal use of the LaBerges' rural property is unreasonable is clearly erroneous and unsupported by the evidence.  In connection with this argument, the LaBerges specifically challenge several of the court's findings.  We begin with the constitutional challenge to the ordinance, then turn to the LaBerges' objections to the trial court's findings and conclusions.

4

## I. Constitutionality of Hinesburg's Performance Standards

¶ 13.    The LaBerges argue that the noise restrictions in Section 5.12.1 of the Town's noise ordinance are vague, ambiguous, and standardless and, accordingly, are void and unenforceable on their face.   The Fenwicks respond on the merits, but also argue that the constitutional issues were not properly preserved.   We reject the contention that the constitutional issues were not properly preserved, but affirm the trial court's determination that the noise ordinance is not unconstitutionally vague.

¶ 14.    On the preservation question, the Fenwicks argue that the constitutional issue was never properly presented to the Environmental Division because the LaBerges did not cross-appeal the DRB's decision in their favor with their own statement of questions addressing the constitutionality of the Town's noise ordinance.   The Fenwicks assert that the Environmental Division was without jurisdiction to consider the constitutional questions, and we cannot consider them on appeal.

¶ 15.    The Fenwicks are correct that as a general rule the statement of questions defines the Environmental Division's jurisdiction on appeal.  See V.R.E.C.P. 5(f) (stating that appellant "may not raise any question on the appeal not presented in the statement as filed"); In re Garen, 174 Vt. 151, 156, 807 A.2d 448, 451 (2002) (noting appeal to Environmental Division is confined to issues raised in statement of questions).   However, as we recognized in In re Jolly Assocs., the Environmental Division may consider matters that are intrinsic to the statement of questions, even if they are not literally stated in the statement of questions.  2006 VT 132, ¶ 9, 181 Vt. 190, 915 A.2d 282.  The first question presented in this appeal is whether the dirt biking and/or motocross use of the LaBerges' property violates Section 5.12.1 of the Town's regulations.   This question requires the court to consider the meaning and reach of this ordinance, and that consideration directly implicates the LaBerges' argument that the ordinance is so vague that it has no discernible meaning.

¶ 16. Moreover, the goals of our preservation rules are satisfied in this case. The purpose of our preservation rule "is to ensure that the original forum is given an opportunity to rule on an issue prior to our review." In re White, 172 Vt. 335, 343, 779 A.2d 1264, 1270-71 (2001). The LaBerges made their constitutional claims for the first time in a supplemental argument to their previously filed motion for summary judgment, before the court held a hearing on the merits. The arguments were before the court in connection with that hearing, and the court addressed them in its decision. The Environmental Division had an opportunity to consider the issue and found the noise ordinance to be constitutional. See In re Barry, 2011 VT 7, ¶ 29, 189 Vt. 183, 16 A.3d 613 (rejecting Town's argument that landowner failed to preserve claim that permit terms were ambiguous where "Environmental Court plainly had . . . an opportunity" to rule on the issue and "in fact found the critical permit terms to be ambiguous."). For these reasons, we conclude that the constitutional question is properly before us.

¶ 17. On the merits of the constitutional claim, the LaBerges make two related arguments. First, they assert that the noise ordinance does not contain sufficient guidance as to how the identified factors—intensity, duration, and frequency—should be analyzed, measured or weighted, therefore opening the door to arbitrary enforcement. Second, they argue that because of this lack of clarity, a landowner of common intelligence has no way of knowing what conduct is acceptable under the ordinance. Both arguments rely heavily on our analysis in In re Appeal of JAM Golf, LLC, in which we declined to enforce an ordinance that lacked sufficiently specific standards to guide enforcement. 2008 VT 110, ¶¶ 12-14, 185 Vt. 201, 969 A.2d 47. Because both of the LaBerges' arguments hinge on the claim that the Hinesburg noise ordinance is essentially standardless, we consider them together.[1]

---

[1] A section heading in the LaBerges' brief suggests that their first argument springs from the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. However, void-for-vagueness challenges are generally grounded in the Due Process Clause of the Fourteenth Amendment. See Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)

¶ 18.     Generally, we presume statutes to be constitutional.  Badgley v. Walton, 2010 VT 68, ¶ 20, 188 Vt. 367, 10 A.3d 469.  "[T]he proponent of a constitutional challenge has a very weighty burden to overcome."  Id.  See also State ex rel. City of Providence v. Auger, 44 A.3d 1218, 1226 (R.I. 2012) ("When we review a challenge to a statute or ordinance, we begin with a presumption that the enactment is constitutional.").

¶ 19.     In JAM Golf, LLC, we recognized that a municipal zoning ordinance that fails to provide sufficient standards to adequately guide applicants and decisionmakers violates property owners' due process rights.  2008 VT 110, ¶¶ 12-14.  That case involved a dispute between a landowner and the City of South Burlington.  The landowner, which owned a 450-acre planned residential development (PRD), sought permits for ten additional lots in a portion of the development known as "the woodland."  The City of South Burlington denied the permit request, relying on a zoning ordinance which directed PRDs to "protect important natural resources

_____

(noting that "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined"); Brody v. Barasch, 155 Vt. 103, 110, 582 A.2d 132, 137 (1990) (explaining that due process requires that "[a] statute must be sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is proscribed"); State v. DeLaBruere, 154 Vt. 237, 271, 577 A.2d 254, 273-74 (1990) ("In order to withstand a void-for-vagueness attack, a criminal statute must 'define a criminal offense with sufficient certainty so as to inform a person of ordinary intelligence of conduct which is proscribed, and such that arbitrary and discriminatory enforcement is not encouraged.") (quoting State v. Cantrell, 151 Vt. 130, 133, 558 A.2d 639, 641 (1989)); see also LDS, Inc. v. Healy, 589 P.2d 490, 491 (Colo. 1979) ("The vagueness doctrine is grounded upon two closely-related principles of the due process clause of the Fourteenth Amendment.  First, a statute is void for vagueness if its prohibitions are not sufficiently defined to as to give fair warning as to what conduct is prohibited. . . . Second, a statute is too vague where it contains no explicit standards for application so that a danger of arbitrary and capricious enforcement exists.").

The LaBerges did not rely on equal protection principles below, and on appeal they cite no authority or argument anchoring their claim in equal protection.  They do not claim membership in a class or group, or that the Town has treated them differently from others similarly situated without a rational basis.  See Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (holding that plaintiff who does not allege membership in class or group may pursue equal protection claim brought by "class of one" where plaintiff alleges that he or she has been intentionally treated differently from others similarly situated and that there is no rational basis for difference in treatment).  Accordingly, we conclude that both prongs of the LaBerges' constitutional argument, as actually briefed, are grounded in due process.

including . . . scenic views" and "wildlife habitats." Id. ¶ 4 (internal quotation marks omitted). The Environmental Division affirmed the denial, and the landowner appealed to this Court. We ruled for the landowner on the ground that the ordinance as written was "essentially standardless." Id. ¶ 13. We explained:

> "Protect," as defined [in the ordinance], cannot be the equivalent of total preservation, because the same regulations allow for development, which, by necessity, must reduce wildlife habitat and affect scenic views. How much less than total preservation qualifies as sufficient protection, however, we cannot know, because the regulations do not say. Even had the trial court endeavored to apply a "reasonableness" measure to this term, [the ordinance] would be unworkable. The language of the regulation offers no guidance as to what degree of preservation short of destruction is acceptable under the statute. From a regulatory standpoint, therefore, [the ordinance] provides no guidance as to what may fairly be expected from landowners who own a parcel containing wildlife habitat or scenic views—both common situations in Vermont—and who wish to develop their property into a PRD. Such standardless discretion violates property owners' due process rights.

Id. ¶ 14.

¶ 20. The critical question in this case is whether the same critique applies to the ordinance here, which proscribes unreasonable noise, and identifies the factors—intensity, duration, and frequency—by which reasonableness should be measured.

¶ 21. In the context of a challenge to a municipal noise ordinance that did not include a numeric decibel standard but instead referred to "customary or reasonably expected" noise, we explained:

> It is not unreasonable for the Town to establish noise limit standards that take into account surrounding uses and the expectations created by those uses. Although we have applied the constitutional vagueness standard in regulatory circumstances, we have noted that we are dealing with an area where some imprecision and generality is necessary and inevitable and our void-for-vagueness test is less strict where the regulation is economic and the landowner can seek clarification of its meaning or resort to administrative processes.

8

In re Ferrera & Fenn Gravel Pit, 2013 VT 97, ¶ 16, 195 Vt. 138, 87 A.3d 483 (internal quotations and alterations omitted). We rejected the suggestion that anything other than a numeric decibel standard was unacceptable, and concluded that the town's noise limit standard was not so vague that it was "essentially without an ascertainable standard." Id.; see also Grayned, 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language.").

¶ 22. Indeed, the standard of reasonableness at the heart of the Town's noise ordinance is one that numerous courts have upheld against void-for-vagueness challenges. See, e.g., Reeves v. McConn, 631 F.2d 377, 3886 (5th Cir. 1980) (upholding ordinance prohibiting noise that is "unreasonably loud, raucous, jarring, disturbing, or a nuisance to persons within the area of audibility"); Howard Opera House Assocs. v. Urban Outfitters, Inc., 322 F.3d 125, 127 (2d Cir. 2003) (upholding Burlington ordinance prohibiting "loud or unreasonable noise" and defining "unreasonable" as noise that "disturbs, injures or endangers the peace or health of another or . . . endangers the health, safety or welfare of the community"); Town of Baldwin v. Carter, 2002 ME 52, ¶¶ 2, 12, 794 A.2d 62 (upholding Town's dog bark ordinance after court read objective reasonableness requirement into ordinance prohibiting dog barking that "unnecessarily annoy[ed] or disturb[ed] any person"); State v. Holland, 331 A.2d 626, 632 (N.J. App. Div. 1975) (holding that ordinance prohibiting loud and unnecessary noises, i.e. those which are unreasonable in the circumstances, "fairly apprises the public and the defendant of what it proscribes"); Columbus v. Kim, 886 N.E.2d 217, 219-20 (Ohio 2008) (upholding ordinance regulating keeping of animals that are unreasonably loud or disturbing because ordinance incorporates objective "reasonableness" standard and provides factors—namely, "character, intensity and duration" of disturbances by which reasonableness can be measured); Auger, 44 A.3d at 1235-36 (upholding City of Providence's ordinance governing volume of radios, television sets, and similar devices and noting that ordinance's standard of

9

"reasonableness" is one that a plethora of courts have upheld as not void for vagueness). Cf. City of Lincoln Center v. Farmway Co-Op, Inc., 316 P.3d 707, 714 (Kan. 2013) (finding City's noise ordinance unconstitutionally vague because reasonableness component was disjunctive, resulting in "no guarantee that conduct will only be punished when based exclusively on the objective standards"). But see Tanner v. City of Virginia Beach, 674 S.E.2d 848, 853 (Va. 2009) (overturning City's noise ordinance prohibiting "unreasonably loud, disturbing and unnecessary noise" that was "of such character, intensity and duration as to be detrimental to the life or health of persons of reasonable sensitivity" or that "disturb[s] or annoy[s] the quiet, comfort or repose of reasonable persons" (internal quotation marks omitted)).

¶ 23.   In addition to incorporating an objective "reasonableness" standard, the ordinance in this case identifies key factors in assessing reasonableness: intensity, duration, and frequency—guidance that further focuses the reasonableness inquiry, guards against arbitrary enforcement, and puts individuals on notice of the law's requirements.

¶ 24.   The ZA's statement in his NOV letter to the LaBerges that his application of the ordinance was "arbitrary" does not change our assessment. In the same letter, the ZA described and considered the three listed factors. He stated:

> On July 22, 2013, I observed noise measurements in the high 80 Db range coming from motorbikes ridden on your property. The duration of this sound was approximately 10 to 15 seconds, and its frequency was about every five minutes while I was present. The frequency of the use of the track, reported to be on or about June 3, July 7 and July 22. The combination of all of these factors has created an unreasonable noise.

Moreover, in his testimony at the hearing, the ZA explained that it would have been difficult to have a conversation during the loud periods. He described the noise as "startling," adding "I don't startle easily, and . . . even there sort of expecting this to happen it was a significant impact of noise." Despite the ZA's statement that his application was arbitrary, the record reflects that

he made an objective determination that the LaBerges were in violation of the ordinance as supported by his observations and consideration of the three listed factors.

¶ 25. For the above reasons, we conclude that the noise ordinance is not unconstitutional on its face.[2] As one court has explained, "[t]he fact that there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is not a sufficient reason to hold the language too ambiguous to define a penal offense." Holland, 331 A.2d at 630.

¶ 26. We also conclude that, as applied in this case, the ordinance gave the LaBerges fair notice that the noise level, frequency, and duration at issue would be proscribed. We note at the outset that 80 dBA at the property line is a very high noise level. Municipal ordinances and general development standards frequently identify 70 dBA as a maximum allowable noise level at a property boundary. See, e.g., In re Fowler, No. 159-10-11 Vtec, slip op. at 4 (Vt. Super Ct. Envtl. Div. Feb. 4, 2013) (Durkin, J.) (applying town noise ordinance prohibiting noise above 70 dBA); In re Champlain Oil Co., Inc., No. 89-7-11 Vtec, slip op. at 22 (Vt. Super Ct. Envtl. Div. Oct. 10, 2012) (Durkin, J.) (granting conditional use approval where project site would not exceed noise level of 70 dBA as required by town ordinance); In re Sheldrick Building Permit, No. 185-9-07 Vtec, slip op. at 10 (Vt. Super. Ct. Envtl. Div. Apr. 23, 2009) (Durkin, J.) (approving zoning permit for workshop which would not produce noise above 70 dBA in compliance with town noise ordinance); Appeal of Penmar Farm, No. 113-7-03 Vtec slip op. at 8 (Vt. Super. Ct. Envtl. Div. Oct. 17, 2005) (Wright, J.) (approving conditional use permit for gravel pit where noise generated by project would not exceed 70 dBA at property line and would not exceed 50 dBA at any nearby residences). The noise level at issue in this case, exceeding 80

---

[2] Where a party raises a facial challenge to an ordinance that implicates no constitutionally protected conduct, that party must show that the ordinance is "impermissibly vague in all of its applications." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982). It is not entirely clear whether the LaBerges intended to make a facial or an as-applied challenge in this case. We consider both.

11

dBA, was more than twice as loud as this often-used limit. See In re Chaves A250 Permit Reconsider, 2014 VT 5, ¶ 31 n.4, 195 Vt. 467, 93 A.3d 69 (noting expert testimony that decibel scale is logarithmic so that for every 10 dB increase, loudness appears to double).

¶ 27.   Although the focus of the LaBerges' arguments on appeal is the decibel measurements described by the trial court, we note that the trial court did not rely exclusively on decibel measurements in reaching its conclusion. The court specifically credited Ms. Fenwick's testimony that the noise was "extremely loud, irritating, assaultive, and disruptive." And the duration of the noise—ten to fifteen seconds every five minutes over the course of two hours— distinguishes this from a loud but infrequent or short noise.

¶ 28.   For the above reasons, we conclude that the Town's noise ordinance passes constitutional muster, on its face and as applied in this case.

## II. Trial Court's Application of the Ordinance

¶ 29.   The LaBerges argue generally that the trial court's conclusion that the noise in question here was unreasonable is not supported by the evidence. In support of this general argument, they argue more specifically that the trial court: (1) improperly admitted and relied upon World Health Organization (WHO) standards on noise levels; (2) erred in relying on the noise level data provided by Mr. Fenwick; (3) erroneously relied on expert testimony regarding noise levels measured on the Fenwick property more than a year after the events at issue here, and at a time when motorcycles were not ridden on the track; (4) erred in finding that three instances of such noise levels occurred;  and (5) erred in assessing the duration of the motorcycle riding events. We consider each argument in turn.

¶ 30.   First, we conclude that the trial court properly admitted the WHO noise guidelines considered by the Fenwicks' expert in reaching his opinion as to the reasonableness of the noise levels at issue in this case. The Fenwicks' expert offered testimony based, in part, on the WHO noise guidelines. The LaBerges objected to admission of the WHO noise guidelines on the basis

12

of relevance, arguing that the Town's noise ordinance did not include specific decibel limitations, so the limitations in the WHO guidelines are irrelevant to this case. The trial court admitted the standards on the basis that the noise expert relied upon them in order to reach his expert opinion regarding the reasonableness of the noise in question.

¶ 31. We reverse the environmental division's admission of evidence only if the court abused its discretion or prejudice resulted. In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 90, 199 Vt. 19, 121 A.3d 630. Vermont Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" if it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Experts may use non-binding standards to inform their expert opinion. Lees v. Carthage Coll., 714 F.3d 516, 525 (7th Cir. 2013) (reversing district court's exclusion of expert testimony on campus safety where expert's opinion was based upon non-binding but widely consulted industry standards); see also Robertson v. Burlington Northern R. Co., 32 F.3d 408, 411 (9th Cir. 1994) (holding that district court did not abuse its discretion in admitting OSHA noise standards to help establish standard of care even though defendant railroad was not subject to regulations). The Fenwicks' sound expert's testimony was based in part upon the WHO standards. Vermont Rule of Evidence 703 allows experts to present their opinions based upon information that may otherwise be inadmissible as long as the information is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The expert testified that the WHO standards "are typically used as a reference level." The trial court did not abuse its discretion in admitting the WHO standards. See In re Waterfront Park Act 250 Amendment, 2016 VT 39, ¶ 25, __ Vt. __ , __ A.3d __ (recognizing that WHO guidelines "provide a scientific basis for ascertaining noise levels that cause serious annoyance and sleep disturbance " (quotations omitted)).

¶ 32. Nor did the trial court import the WHO standards into the Hinesburg ordinance, as the LaBerges suggest. Although the court heard expert testimony as to the WHO-recommended

noise limits for residential areas outdoors (55 dBA), its opinion does not support the LaBerges assertion that the court adopted the WHO guidelines as the standard governing application of the Hinesburg ordinance.

¶ 33. Second, we conclude that the trial court did not err in allowing and considering testimony concerning the July 22, 2013 sound-level measurements taken by Mr. Fenwick. At trial, the court declined to allow the ZA to testify about the readings he observed on the Fenwicks' sound meter at the time that he and the Fenwicks jointly observed the motorcycle riding. The court explained that in such cases, its practice was to allow a property owner who had purchased and used a sound meter to explain how well they know how to operate it, how they operated it during a time of concern, and what results the meter showed. The court noted that it would afford the readings the appropriate weight based upon the credibility of the testimony. Accordingly, later in the hearing and without objection, Mr. Fenwick testified about his use of the sound meter and his measurements of the sound level on the evening of July 22.

¶ 34. On appeal, the LaBerges do not challenge the court's admission of the testimony but instead, argue that the court "erroneously relied" on the data. They point out that the device Mr. Fenwick used was not authenticated or admitted at trial, that Mr. Fenwick could not identify where he was standing, and that the court lacked information about weather conditions, wind direction and velocity, background noise, the height of the device while being used, whether or not the device was properly calibrated, and if it even functioned at all. In short, the LaBerges contest the weight they believe the trial court gave the evidence.

¶ 35. The trial court "enjoys broad discretion in assessing the credibility and weight of a witness' testimony, and we will not second-guess these determinations on appeal." In re Eastview at Middlebury, Inc., 2009 VT 98, ¶ 36, 187 Vt. 208, 992 A.2d 1014. The points the LaBerges make on appeal would have been reasonable fodder for cross examination, but are not grounds for reversal of the trial court's factfinding. Moreover, it is not clear how much the trial

14

court relied on Mr. Fenwick's measurements in isolation. When explaining its inclination to admit Mr. Fenwick's testimony about the sound-level readings he took, the trial court noted that it was uneasy relying solely on such testimony; it later noted that the anticipated expert testimony might lend credibility to Mr. Fenwick's measurements. As described below, Mr. Fenwick's 80 dBA reading was subsequently corroborated by an expert's measurements. Given these considerations, the trial court's finding that the sound levels at the property line were 80 dBA was not clearly erroneous.

¶ 36. Third, we conclude that the trial court did not err in admitting and crediting testimony by the Fenwicks' expert concerning the sound levels at their property line associated with operation of motorcycles on the LaBerges' track. At trial, the Fenwicks sought to introduce testimony from their expert regarding sound levels at various spots on their property as measured by the expert. The LaBerges objected to the admission of this evidence on the ground that the sound levels measured were not necessarily the same as the noise that gave rise to the NOV. In particular, the Fenwicks' expert measured the sound levels more than a year after the events that gave rise to the NOV and was not personally present to confirm that his tool recorded noise from motorcycles on the LaBerge property versus other sources. Because Mr. Fenwick had testified about events that occurred throughout the measurement period, including the revving of motorcycle engines on the LaBerge property, the trial court admitted the testimony. On appeal, the Laberges argue that the court erred by assigning weight to the expert's data because it had no connection in time to the July 22, 2013 NOV.

¶ 37. The LaBerges' suggestion that there was no link between the expert's measurements and the noise that gave rise to this NOV is not supported by the record. Although the expert was not personally present throughout the monitoring period, Mr. Fenwick was. He testified to the various noises throughout the period, such as gunshots, and the expert correlated Mr. Fenwick's various observations to different readings on his meters. Mr. Fenwick testified

15

that the sound of revving motorcycle engines (rather than actual riding around the track) during his expert's sound-level testing was identical to the sound he heard when standing by his property line with the ZA on July 22, 2013. This testimony connected the expert's measurements to the noise disturbance that gave rise to the NOV, and the trial court acted within its discretion in crediting the testimony.

¶ 38. Fourth, we conclude that the trial court's finding that motorcycles on the LaBerges' property operated in a similar fashion, with similar noise levels and for similar duration on two other occasions within two months of the NOV was supported by substantial evidence in the record. The trial court found that the LaBerges used motorcross racing motorcycles on June 3, June 22, and July 7, 2013—a finding that related to the court's consideration of the frequency of the objectionable noise. On appeal, the LaBerges' argue that this finding was clearly erroneous. They emphasize that the ZA did not personally witness motorcycles on their track on June 3 and July 7, 2013, and that Mr. LaBerge testified unequivocally that on each of those days there was no riding on the property.

¶ 39. "We are deferential to a trial court's findings of fact, and will uphold them unless clearly erroneous." Unifund CCR Partners v. Zimmer, 2016 VT 33, ¶ 10, __ Vt. __, __ A.3d __; V.R.C.P. 52(a)(2). "The findings will stand if there is any reasonable and credible evidence to support them." Jarvis v. Gillespie, 155 Vt. 633, 637, 587 A.2d 981, 984 (1991). Mr. Fenwick testified before the Environmental Division that the alleged riding did occur on, or approximately on, the dates in question. He explained that he would call the ZA in the evening when there was riding, and then would email the ZA the next day if he didn't hear back. Because the ZA may have relied on the emails in identifying the other dates listed in the NOV, there might be a minor discrepancy in the dates. In his own testimony, although Mr. LaBerge claimed that a couple of the dates listed in the NOV were one day off, he did not dispute that the riding occurred and specifically acknowledged, "[w]e did some riding around those dates." Whether the riding in

16

question occurred on June 2 or June 3 had no impact on the trial court's assessment of the frequency of the riding events. Nor is there any suggestion that the specific date of each episode of riding was relevant to the LaBerges' defense. Under these circumstances, even if the trial court's findings as to the specific dates of the two other instances of noisy riding were off by a day, any error would be harmless. See V.R.C.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.")

¶ 40.    Finally, we reject the LaBerges' contention that the trial court erred in finding that the LaBerges rode their motorcycles for between one and two hours. Mr. LaBerge testified that his sons generally rode in two twenty-minute segments, separated by a break in between, and occasionally there would be one additional twenty-minute segment. But, Mr. Fenwick testified that on June 22 the LaBerges rode for an hour and a half to two hours, and his wife testified that the riding sessions usually lasted two hours. The trial court's finding on this point is amply supported in the record.

Affirmed.

FOR THE COURT:

_____

Associate Justice

17