STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| | Docket No. 121-10-16 Vtec |

| | |
|---|---|
| Mahaiwe, LLC Site Plan & Conditional Use Approval | |

## Decision in On-The-Record Appeal

This on-the-record appeal presents an unusual case. Mahaiwe, LLC ("Mahaiwe") proposed specific lighting and fencing as part of a conditional use and site plan review application. The City of Vergennes Development Review Board ("the DRB") included the fencing proposal as a condition in its September 12, 2016 approval of the application. Mahaiwe now appeals the fencing condition, and challenges whether the lighting that it proposed is part of the approval.

Mahaiwe is represented by Colin R. Hagan, Esq. and David J. Shlansky, Esq., and the City of Vergennes ("the City") is represented by James H. Ouimette, Esq.

## On-The-Record Scope and Standard of Review

This is an on-the-record appeal. See 24 V.S.A. § 4471(b). As such, we review the decision below, the record made before the municipal panel, and the briefs submitted by the parties. In re Saman ROW Approval, No. 176-10-10 Vtec, slip op. at 1–3 (Vt. Super. Ct. Envtl. Div. Sept. 2, 2011) (Durkin, J.). Our review is further limited to the issues raised in the Statement of Questions. V.R.E.C.P. 5(f).

We are directed to affirm the DRB findings if they are "supported by substantial evidence," but should "review the DRB's legal conclusions without deference where such conclusions are outside the DRB's area of expertise." In re Stowe Highlands Resort PUD to PRD Application, 2009 VT 76, ¶ 7, 186 Vt. 568 (citation omitted).

## Background

The background and procedural history of this matter is set out at some length in an April 28, 2017 decision.  Mahaiwe, LLC SP & CU, No. 121-10-16 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. Apr. 28, 2017) (Durkin, J.).  We briefly recount some of the more salient issues here.

Mahaiwe filed its application for site plan approval and a conditional use permit to convert two buildings.  Part of the property is on the waterfront, with a substantial drop to the water.  Some of the existing fencing at the waterfront is post and chain, and some post and lattice, and there are some gaps in the fencing.

The initial application details the type of exterior lighting to be used on the project.  Over a series of communications between Mahaiwe and the City during the application process, Mahaiwe subsequently proposed two fencing options for the waterfront: to maintain the existing fence (Option I), or to replace it with vertical metal posts bolted into the ground, two top rails and one bottom rail between them, and vertical metal pickets between the bottom rail and the lower top rail (Option II).

The DRB approved the application with the following condition:

> The Applicant shall replace and install perimeter fencing on the Norton Grist Mill property including modifications to close off any breaks in the fencing that currently exist.  The fencing shall be substantially identical with the perimeter fencing . . . as proposed by the Applicant in Option II.

A second condition requires Mahaiwe to obtain a certificate of occupancy confirming that the fencing is installed as called for in the first condition.

## Procedural History

Mahaiwe's Statement of Questions includes 16 Questions.  On Mahaiwe's request, we addressed the merits of Questions 1, 2, 6, 7, 9, 10, and 13 and affirmed the DRB's decision in our April 28, 2017 decision.

Mahaiwe filed a motion to reconsider on May 8, 2017, asking leave to brief those Questions not addressed in the April 28, 2017 decision.  We granted this request in a July 24, 2017 entry order, limited to Questions 7, 8, 11, 12, and 14–16.  We directed the parties to avoid repeating arguments already made and reminded the parties that we cannot issue advisory opinions.

2

The remaining Questions are as follows:

**Question 7**: Does the Constitution of the State of Vermont prohibit the DRB from imposing the conditions set forth in its Decision?

**Question 8**: Does the Charter of the City of Vergennes, Vermont, fail to enable the DRB imposing [sic] the conditions set forth in its Decision?

**Question 11**: Are the conditions set forth in the DRB Decision (such as fencing) permanently fixed such that any alteration hereafter requires DRB approval, based on the existing regulations?

**Question 12**: If the answer to the foregoing questions is "yes," what is the quantum of change that requires DRB approval (and what standards) in the current regulations would apply and guide such change review?

**Question 14**: Please see Questions 1 through 12. If the answer to Question 11 is "yes," then apply each of Question 1 through 12 to the specifications on lighting (including locations and types).

**Question 15**: Are the landscape specifications and depictions, such as (without limitation) walkway fence posts, ramps, bushes, perennial plantings, edging, and outdoor seats, contained in Applicant's application (only part of which was attached by the DRB to its Decision), as purportedly required by the DRB, incorporated by reference into the permit conditions and made into binding permit conditions (as alleged by the DRB)?

**Question 16**: Please see Questions 1 through 12. If the answer to Question 15 is "yes," then apply each of Question 1 through 12 to the specifications on lighting (including locations and types).

**Discussion**

Mahaiwe addresses the legal issues raised in its remaining Questions by presenting six legal arguments in its brief. While some of these arguments do not fit neatly under the Questions as presented, we grant that they could be construed as falling within issues that are at least intrinsic to the Statement of Questions. See In re Jolley Assocs., 2006 VT 132, ¶ 9, 181 Vt. 190. Further, some of Mahaiwe's arguments have already been addressed by the Court, and some appear to relate to Questions that were not to be briefed pursuant to our July 24, 2017 order.

Nevertheless, in the interest of addressing the full scope of issues, we address Mahaiwe's arguments in turn.

**Argument 1: The DRB is preempted from imposing the stated conditions in its decision.**

Mahaiwe argues that the regulation of public safety in and around public buildings, like the one at issue here, is granted to the Commissioner of Public Safety, and that this preempts any authority that the City may have to regulate safety.

A municipal body's "power is derivative, based upon an allocation of authority from the state. Where conflict occurs, and no resolution is statutorily prescribed, the municipality must yield." Morse v. Vermont Div. of State Bldgs., 136 Vt. 253, 255 (1978). Our Supreme Court has cautioned that this preemption must be "carefully invoked," and that, where possible, laws should be construed "to harmonize and give effect to each, if they can be viewed so as to operate without conflict and without compromise as to the purpose of the superior enactment." In re Patch, 140 Vt. 158, 176–77 (1981).

The City's power to regulate safety stems from the Vermont Planning and Development Act, which authorizes municipalities to regulate land development in relation to "public health, safety, and welfare." 24 V.S.A. § 4411(a); see also 24 V.S.A. § 4302(a). This delegated power is exercised in the City of Vergennes Zoning and Subdivision Regulations, effective December 10, 2015 ("the Regulations"), which regulate safety at §§ 102, 103, 702, 802, 803.[1]

Mahaiwe cites 20 V.S.A. § 2731(a) as grounds for its preemption argument. This statute gives the Commissioner of Public Safety authority to regulate "the construction of buildings, maintenance and operation of premises, and prevention of fires and removal of fire hazards, and to prescribe standards necessary to protect the public, employees, and property against harm arising out of or likely to arise out of fire." 20 V.S.A. § 2731(a). This statute is in Title 20, Part 7: Fire Protection and Fire Prevention, Chapter 173: Prevention and Investigation of Fires, Subchapter 2: Fire Safety Division. The language of the statute itself, and the titles of the chapter and subchapter in which it is found, indicate that the statute is specifically related to fire safety. See Morse, 136 Vt. at 256 (looking at context of statute to determine whether there is a

---

[1] Our April 28, 2017 decision explains how these regulations deal with safety and we incorporate that explanation here by reference.

preemption conflict). Mahaiwe also cites rules promulgated pursuant to § 2731(a), including 17-3 Vt. Code. R. § 1:2, which adopts amended portions of international codes "for the purpose of making rides [sic] regarding the safeguarding of people and property in case of fire, explosion, hazardous materials, dangerous structural conditions and the generation of carbon monoxide."[2]

The statutes and regulations here can be read in a manner that avoids conflict. The zoning regulations and their enabling statutes allow for the regulations of land use for public health, safety, and welfare generally. The statutes and regulations stated in or arising from 20 V.S.A. § 2731(a) deal with regulating safety in relation to fire and fire prevention. While these separate regulatory regimes might overlap under certain circumstances, they do not overlap here. In this case, the Regulations regulate safety issues where there is a danger of people falling off a steep drop into a waterway, and there is no conflict with the fire safety regulations cited by Mahaiwe. We therefore decline to adopt Mahaiwe's argument here and reject it as a basis for overturning the DRB's inclusions of conditions into its approval of Mahaiwe's application.

**Argument 2: The DRB has no authority to attach the conditions in its decision**

Mahaiwe cites Dillon's Rule to argue that the relevant statutes do not expressly grant the DRB authority to consider "fencing" or "fall protection," and so the DRB has no such authority. City of Montpelier v. Barnett, 2012 VT 32, ¶ 20, 191 Vt. 441 ("a municipality has only those powers and functions specifically authorized by the legislature, and such additional functions as may be incident, subordinate or necessary to the exercise thereof") (quotation omitted).

Again, municipalities may regulate land development in relation to "public health, safety, and welfare." 24 V.S.A. § 4411(a); see also 24 V.S.A. § 4302(a). In conditional use and site plan approval—which Mahaiwe requests here—the DRB may attach "reasonable conditions and safeguards" to a land use application approval "as it deems necessary to implement the purposes of [Title 24, ch. 117] and the pertinent bylaws and the municipal plan then in effect." 24 V.S.A. § 4464(b)(2); see also 24 V.S.A. § 4416(a). A municipality's power to regulate through zoning has been read broadly. See, e.g. In re Letourneau, 168 Vt. 539, 544, 726 A.2d 31, 35 (1998) ("zoning ordinances are presumed valid"); State v. Sanguinetti, 141 Vt. 349, 351 (1982) ("The law is well

---

[2] This regulation was amended effective September 22, 2016, after the DRB issued its decision in this case. While the current regulation adopts the 2015 versions of various codes, the version applicable to this application adopts the 2012 versions of codes.

settled that governments may exercise their regulatory power to institute zoning . . . when the zoning reasonably relates to the public health, safety, morals or welfare.").

Because the legislature specifically granted municipalities the power to regulate safety through zoning and to attach conditions to permit approvals, the attachment of conditions here does not violate Dillon's Rule. We therefore reject Mahaiwe's argument here as a basis for overturning the DRB's inclusions of conditions into its approval of Mahaiwe's application.

**Argument 3: The DRB's decision violated Appellant's due process rights as the regulations fail to articulate a safety standard**

We addressed this issue briefly in our April 28, 2017 decision, where we noted that the standards set out in the Regulations "are based on a reasonable person's understanding of safety, which is not an impermissibly vague benchmark." Mahaiwe, No. 121-10-16 Vtec at 7 (Apr. 28, 2017) (citing In re Laberge NOV, 2016 VT 99, ¶¶ 17–22).

We revisit the issue here.

Mahaiwe's argument conflates two principles of zoning law. The first, grounded in constitutional due process, requires zoning regulations to provide sufficient "guidance as to what may be fairly expected from landowners." In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶¶ 12–14, 185 Vt. 201 (citations omitted). The second, a creation of statute, allows a municipal panel to "attach additional reasonable conditions and safeguards as it deems necessary to implement the purposes of [the Vermont Planning and Development Act] and the pertinent bylaws and the municipal plan then in effect." 24 V.S.A. § 4464(b)(2).

The first, due process principle arises in disputes over whether a use conforms with a zoning provision, and either the proponent of the use challenges the zoning provision as unconstitutionally vague, e.g. In re LaBerge NOV, 2016 VT 99, ¶ 13, 203 Vt. 98, or the opponent of a use alleges that a zoning provision is sufficiently specific to prohibit the use, e.g. In re Howard Ctr. Renovation Permit, 2014 VT 60, ¶ 16, 196 Vt. 542. This case fits neither scenario. The DRB decision does not conclude that Mahaiwe's proposed use fails to conform with any specific zoning provision. Nor does Mahaiwe allege that a specific provision of the Regulations is unconstitutionally vague as applied to its application.

The second, statutory principle allows permit applications to be approved, subject to reasonable conditions. 24 V.S.A. §§ 4464(b)(2), 4416(a). This principle arises when the municipal

6

panel (or the Court, on appeal) approves a proposed use, but attaches certain conditions to that approval, or when the permittee challenges a condition as unreasonable or unnecessary. E.g. Island Arts CU, No. 41-4-17 Vtec, slip op. at 1, 7 (Vt. Super. Ct. Envtl. Div., Mar. 23, 2018) (Walsh, J.).

Here, Mahaiwe argues that the conditions imposed by the DRB are unnecessary or unreasonable. This invokes the second principle, not the first.[3]

Municipal panels have "broad discretion" in attaching conditions to approved permits. In re Miller, 170 Vt. 64, 73 (1999). That discretion is routinely exercised to impose conditions that are grounded on general provisions set out in the zoning regulations, while being specifically tailored to the proposed use. See, e.g., In re Kostenblatt, 161 Vt. 292, 295 (1994) (imposing conditions restricting hours of operation for shooting range, where bylaws call for general prohibition on undue noise, odor, smoke, dust, dangerous traffic); In re Woodstock Cmty. Trust, No. 203-10-09 Vtec, slip op. at 13–16 (Vt. Envtl. Ct. Oct. 14, 2011) (Wright, J.) (imposing condition requiring fencing where zoning regulation allows uses to be conditioned on screening); Appeal of Penmar Farm, No. 113-7-03 Vtec, slip op. at 13 n.5 (Vt. Envtl. Ct. Oct. 17, 2005) (Wright, J.) (requiring installation of fence for safety as a condition in conditional use permit approval); Appeal of Agnes Mitchell Tr., No. 10-1-03 Vtec, slip op. at 6 (Vt. Envtl. Ct. Aug. 26, 2004) (Wright, J.) (requiring installation of wood or stone fence between 1 and 4 feet in height to mark protected vegetation zone as part of conditional use approval); In re: Appeal of Robert E. Schmidt, No. E96-204, 1997 WL 34621231 (Vt. Envtl. Ct. Aug. 19, 1997) (Wright, J.) (requiring installation of fence or hedge for screening as part of conditional use approval).

Promoting safety is among the general purposes of the Regulations. Regulations §§ 102, 103. In addition, site plan review applications must include "proposals for mitigating impacts and hazards." Regulations § 702(6). The site plan review procedure states that the DRB:

> shall review the site plan and supporting data, taking into consideration the following objectives:
>
> . . .

---

[3] These two principles come together under a third principle, that conditions may be impermissible if they are too vague to inform the landowner of what is required. In re Farrell & Desautels, Inc., 135 Vt. 614, 616–17 (1978). This third principle is not raised in this matter.

4. Provision of safe pedestrian facilities including connections to the street network and on-site circulation.

5. Adequacy of landscaping, screening, and setbacks in regard to achieving compatibility and protection to adjacent property and existing natural features.

Regulations § 703.

A conditional use permit is issued "only if the [DRB] determines the proposed use will conform to the general and specific standards set forth in Section 803." Regulations § 801. "Specific standards shall include requirements with respect to . . . 5. Landscaping and fencing." Regulations § 803. In the Otter Creek Basin Zoning District ("OCB District"), where this project is located, "[d]evelopment and redevelopment shall be sensitive to the unique environmental qualities of the area." Regulations § 1610. The Regulations also incorporate the 24 V.S.A. § 4464(b) language reserving the right to attach reasonable conditions to approved permits. Regulations § 508.

We conclude that conditioning approval on the installation of a fence is reasonable in light of the risk posed by the nearby waterway, and given the safety requirements and right to attach conditions set out in the zoning provisions. The fencing required by the challenged condition addresses such safety concerns. Mahaiwe does not challenge the ability of the required fencing to reasonably address the safety issues posed by its site and proposed improvements. In fact, the required fencing was initially suggested by Mahaiwe. We conclude that their due process attack on the DRB's authority to impose such a condition is without merit.

**Argument 4: The DRB conclusion that the fence is unsafe is a legal conclusion based on no objective standard**

Mahaiwe argues, as in Argument 3 discussed above, that there is no objective standard to determine what kind of fence is required to meet the Regulations' safety standard. Therefore, the argument goes, requiring a certain type of fence is arbitrary.

The DRB determination that the existing fence is unsafe is a factual finding, not a legal conclusion. Specifically, the decision states:

The [DRB] finds the design and construction of said system of posts and chain does not provide adequate fall protection and therefore is deemed substandard for the proposed use of the property as a multiple-family dwelling with nine dwelling units, particularly when considering the potential presence of children on the property. Norton Grist Mill Island is in the middle of Otter Creek at the crest of

8

so-called Vergennes Falls, with a vertical drop of thirty-seven feet, and, therefore, the [DRB] finds that adequate perimeter fencing is required for safety and the existing system of posts and chain as modified as outlined in Option I is not adequate.

In our April 28, 2017 decision, we discussed the factual basis supporting these findings and, under the deferential standard of on-the-record review, affirmed those findings. Mahaiwe, No. 121-10-16 Vtec at 8–9 (Apr. 28, 2017). We have no reason to alter that conclusion here.

Furthermore, we elaborate on our April 28, 2017 analysis to note that the type of fence required by the DRB decision is taller and has fewer and smaller gaps than the existing fence. The factual underpinning implicit in the condition—that the site will be safer with the fence required by the decision than it is with the existing fence—is therefore supported by substantial evidence. We therefore reject this additional attack on the DRB fencing determination.

**Argument 5: Fences do not relate to safety under the Regulations and the DRB's decision is irrational in any event.**

Mahaiwe argues that the Regulations describe fences in terms of enclosure and screening, not for safety, and therefore the DRB cannot require a fence for safety, because that would be reading something into the Regulations that was not intended by the drafters. In re Handy, 171 Vt. 336, 341 (2000).

Again, if the DRB had denied Mahaiwe's application for failing to comply with a specific provision in the Regulations regarding fencing, we could analyze whether the provision in question is sufficiently specific to meet the demands of due process. That is not the situation before us. Instead, the DRB determined that the property has an unsafe physical characteristic and imposed a condition to address that characteristic and make the property safer. As a consequence of imposing this fencing condition, the DRB concluded that Mahaiwe's proposed project could receive conditional use approval. As discussed above, imposing such a condition is within the DRB's authority.

Where the dangerous characteristic is a precipice with a waterway below, and the risk posed is that a person could fall into the water, installing a physical barrier is not an irrational means of mitigating the risk.

Mahaiwe also suggests under Argument 5 that the DRB's decision requires it to install the fence, but not to maintain the fence, and that it could therefore install the fence and then remove

9

it when the certificate of occupancy is obtained. This argument raises the question of what the permit condition means.

Considering that we construe permit conditions according to the rules of statutory construction, In re Wagner & Guay Permit, 2016 VT 96, ¶ 11, 203 Vt. 71, *overruled on other grounds by* In re Confluence Behavioral Health, LLC, 2017 VT 112, ¶ 11, (Dec. 8, 2017), and those rules mitigate against construction that leads to absurd or illogical consequences, Rhodes v. Town of Georgia, 166 Vt. 153, 157 (1997), the permit condition is sufficiently clear to speak for itself. Appeal of Farrell & Desautels, Inc., 135 Vt. 614, 617 (1978).

We are troubled by Mahaiwe's suggestion that it would remove a fence that was required by the DRB, immediately after receiving its certificate of occupancy. However, we decline to address this portion of Mahaiwe's argument, as it appears to seek an impermissible advisory opinion. See In re 232511 Investments, Ltd. d/b/a Stowe Highlands, 2006 VT 27, ¶ 19, 179 Vt. 409. If Mahaiwe were to take such action, it may very well receive the answer to its query in a future enforcement action.

We perceive the DRB's fencing condition as entirely rational. We therefore reject Mahaiwe's argument here.

**Argument 6: The DRB has no authority to impose lighting conditions.**

Mahaiwe argues that the Regulations do not authorize the DRB to impose conditions regarding lighting and contain no enforceable standard regarding lighting.

For site plan review, the application must submit plans which "shall include . . . [l]ocation of . . . lighting." Regulations § 702(5). When conducting site plan review, the DRB must consider "[c]ontainment of excessive light, noise, and other impacts specified in Section 1403 of these regulations." Id. § 703(7). Section 1403(6) sets out standards for lighting. For example, lighting must be shielded and downward-oriented, and must conform with standards on brightness. Id. § 1403(6).

Mahaiwe's application includes a printed sheet with an image of a light along with dimensions and details of that light, but makes no other mention of lighting. The DRB decision does not mention of lighting.

Although the DRB did not impose a lighting condition, as we noted in our April 28, 2017 decision, "[t]he approved description of [a] project, as contained in the permit application or attachments," becomes a permit condition. In re Jackson, 2003 VT 45, ¶ 29, 175 Vt. 304 (citing In re Duncan, 155 Vt. 402, 410 (1990)). Conformity with the approved application and plans is required as to "that which is clearly and expressly depicted and does not extend to those elements unstated or implied." In re Foss NOV (Shared Parking), No. 140-9-14 Vtec, slip op. at 4 (Vt. Super. Ct. Envtl. Div. Jul. 30, 2015) (Walsh, J.).

Mahaiwe asks in its brief whether other elements of the design are also permit conditions, and, if so, to what degree they are flexible. We are unable to address this request because it raises issues outside the Statement of Questions and, in part, requests an impermissible advisory opinion. Implicit in the DRB approval is that Mahaiwe is only authorized to build and develop as represented in its application and plans. To the extent that Mahaiwe builds something other than what was approved, it will effectively be building without a permit. Such actions could expose Mahaiwe to enforcement action by the City.

## Conclusion

For the reasons set out above, as well as in our April 28, 2017 Decision, we **AFFIRM** the DRB's September 12, 2016 approval of Mahaiwe's application, including the conditions on fencing.

This completes the current proceedings in this Court concerning this on-the-record appeal. An Amended Judgment Order accompanies this Decision.


Electronically signed on May 10, 2018 at Montpelier, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division

11