NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 39

No. 2015-259

| | |
|---|---|
| In re Waterfront Park Act 250 Amendment (Alison Lockwood, Appellant) | Supreme Court |
| | On Appeal from Superior Court, Environmental Division |
| | December Term, 2015 |

Thomas G. Walsh, J.

Hans G. Huessy of Murphy Sullivan Kronk, Burlington, for Appellant.

Brian S. Dunkiel, Geoffrey H. Hand and Karen L. Tyler of Dunkiel Saunders Elliott Raubvogel & Hand, PLLC, Burlington, for Appellee City of Burlington.

William H. Sorrell, Attorney General, and Robert F. McDougall, Assistant Attorney General, Montpelier, for Appellee Vermont Natural Resources Board.


PRESENT: Skoglund, Robinson and Eaton, JJ., and Tomasi, Supr. J., and Morse, J. (Ret.), Specially Assigned


¶ 1. **ROBINSON, J.** This case requires us to apply Act 250 Rule 34(E), which establishes a framework for determining whether a party may seek to amend an Act 250 permit. Neighbor Alison Lockwood appeals from the Environmental Division's award of summary judgment to the City of Burlington. The Environmental Division ruled that the City is entitled to seek an amendment to its Act 250 permit covering the Waterfront Park located on the shores of Lake Champlain. We affirm.

¶ 2.     The material facts are not substantially in dispute.  In 1990, the City obtained a land-use permit for the Waterfront Park (the Park).  The City hosted a number of events at the Park in the summer of 1993 and may have hosted others prior to that time.  In December 1993, the City applied for an amendment to its permit to allow for hosting of festivals and public events at the Park.  During the amendment process, the City argued against any express permit condition regarding the timing, duration, and frequency of events and sound levels, taking the position that the City Parks and Recreation Commission should regulate these matters.  In February 1994, after considering the impact on neighboring residents caused by noise and traffic from events, the district commission granted the amendment and imposed twenty-six conditions, some of which related to the maximum sound levels associated with events at the Park, when and where to measure those sound levels, and the timing and number of events that could be held at the Park.

¶ 3.     In August 2008, neighbor purchased her property located at 200 Lake Street, which is adjacent to the Park.  Prior to purchasing the property, neighbor researched and read the 1994 Permit.  In buying the property, she specifically relied on the permit conditions governing the timing and frequency of events at the Park and the maximum allowed sound levels.  At the time of her purchase, neighbor was aware that festivals and events would take place at the Park, but she understood these events would be limited by the conditions in the permit.  Neighbor is significantly impacted by the events and festivals.  She experiences loud noise for extended periods of time, significant vehicular and pedestrian traffic congestion, and limits on her ability to sleep, spend time outdoors, open her windows, and enjoy her property.

¶ 4.     Since the Park's inception, there has been significant residential and commercial development in and around the Park, including the Wing Building, Cornerstone Building, 40 College Street (seventy-eight condominiums), the Gateway building, Union Station, 200 Lake Street (sixteen condominiums), ECHO Center, Waterfront Housing, 300 Lake Street (rental

2

units), 60 Lake Street, Westlake Condominiums, Harbor Courtyard Marriott, Hilton Hotel renovations, and 180-188 Battery Street. In addition, festivals and events at the Park have become a central element of the City's and region's cultural life, as well as a central component of the City's downtown economic development strategy.[1] Collectively, the events attract over 185,000 visitors to the Park and the City's downtown, resulting in a substantial economic benefit to businesses in the area and the City as a whole.[2]

¶ 5. In 2013, the City Council adopted PlanBTV, which outlines the City's development goals for downtown Burlington and the waterfront. With respect to the Park, Plan BTV provides:

> Waterfront Park has been wildly successful as a place to host important cultural, civic, and athletic events that bring thousands of people to Burlington's waterfront each year. These events celebrate our community and lakefront, expose new people to the city, and generate millions of dollars for the local economy. The continued evolution of Burlington's waterfront into a mixed-use area that is active year-round will require a careful balance of competing demands. Waterfront businesses and residents need to embrace the important community role played by the park and its many events, while waterfront event planners and organizers need to be sensitive to the impacts that event noise, lighting, and traffic congestion has on their neighbors.

¶ 6. PlanBTV references and incorporates the Burlington Waterfront Revitalization Plan, approved in 1998, which calls for maximizing the use of the Park for festivals and special events and cautions that "the right of the public to use and enjoy the waterfront, including festivals, music and other noise producing activities must not be limited by development." Finally, the City's 2014 Municipal Development Plan emphasizes the importance of arts and

---

[1] Signature events at the Park include: the Burlington Independence Day Celebration; Burlington First Night; Burlington Discover Jazz Festival; Key Bank Vermont City Marathon; Vermont Brewer's Festival; Dragon Boat Festival; Vermont Maritime Festival; USA Triathlon Championship; Penguin Plunge for the Special Olympics; and Lake Champlain Regional Chamber of Commerce Pumpkin Regatta.

[2] For example, the Key Bank Vermont City Marathon and the USA Triathlon generated approximately $8.14 million in local economic activity.

entertainment, as well as recreation and tourism, in expanding economic activity and enhancing the City's quality of life.

¶ 7. This case began in November of 2012 when the City filed an application with the district environmental commission to amend a number of conditions in the 1994 permit. Among the permit conditions the City sought to amend was Condition #19, which reads as follows:

> The following rules shall apply to events held in the park, unless the [City] secures written permission from the District Commission to change these rules.
>
> a) The park can be used for events for up to 27 days between May 27 to September 15.
>
> b) A maximum of 22 days may involve amplified music. Amplified music does not include music from acoustic instruments which is subsequently amplified.
>
> c) No more than 18 of the 27 days may be Saturdays and Sundays.
>
> d) Events may occur on no more than three consecutive weekends.
>
> e) Sound will not exceed 85 decibels, measured at the perimeter of the park nearest the source of the sound. Sound may not exceed 75 decibels measured at the eastern edge of Lake Street adjacent to any residential or commercial property.
>
> f) The cutoff time for amplified music will be 9:45 PM Sunday through Thursday and 10:45 PM on Friday and Saturday.

¶ 8. In its November 2012 application, the City proposed to eliminate the restrictions on dates, total days, and weekend days of events in the Park reflected in Condition #19(a)-(c). The City did not seek to amend Condition #19(d), limiting events to no more than three consecutive weekends. The City requested a detailed substitution for Condition #19(e), regulating maximum sound levels, requiring monitoring of sound levels during events, and

4

limiting sound levels during post-event strike times. And the City sought to extend the cutoff time for amplified sound, or loud motorized sounds authorized by an event permit, to 11:00 p.m.

¶ 9. The district commission granted the City's request and amended Condition #19 to delete 19(a)-(c), and to change the cutoff time in 19(f) to 11:00 PM. With respect to Condition #19(e), the district commission substituted the following provision regulating noise levels in the Park:

> Average equivalent sound levels ($\text{Leq}_{(event)}$) as measured on the sidewalk at a single point in front of the residences on Lake Street nearest to Waterfront Park shall not exceed the following limits over the course of a public event:
> - 74 dBA for events 0 to 2 hours in length
> - 71 dBA for events 2 to 4 hours in length
> - 69 dBA for events 4 to 6 hours in length
> - 68 dBA for events 6 to 8 hours in length
> - 55 dBA Leq and 70 dBA LAFmax for set up and strike down activities from 11:00 PM to 7 AM
> - 65 dBA Leq for set up and strike down activities from 7 AM to 11 PM
> - Independence Day and First Night firework events are exempt from the sound level thresholds. However, any other firework event must receive a permit amendment.
>
> Event length is calculated from opening of gates to closing of gates except for musical concerts when it is calculated from start of amplified music to end of amplified music. Night time is defined as 11 PM to 7 AM for event or festival times.[3]

The district commission also established noise monitoring requirements.

¶ 10. Neighbor appealed the amended land-use permit to the Environmental Division pursuant to 10 V.S.A. § 8504. On appeal before the Environmental Division, the City and neighbor filed cross motions for summary judgment on the threshold question of whether the

---

[3] The district commission's original order set slightly different parameters on sound levels. In response to subsequent motions, the commission revised its original order and permit to provide more clarification.

City was entitled to request the amendments to the 1994 Permit under Act 250 Rule 34(E).[4]  See Code of Vt. Rules 12-004-060.  The Environmental Division granted the City's motion, and denied neighbor's, concluding on the basis of the undisputed evidence that the City had satisfied the threshold requirements for seeking a permit amendment reflected in Rule 34(E).  The parties subsequently stipulated to several revisions to the amended permit that are not directly at issue here, and withdrew all of their respective statements of questions not previously decided by the Environmental Division—essentially stipulating that if the City was entitled to seek to amend the permit conditions, the amended permit satisfies the requirements of Act 250.  Neighbor now appeals the Environmental Division's ruling on the threshold question of whether the City was entitled to request the permit amendment under Rule 34(E).

¶ 11.    The sole issue on appeal is whether the 2013 Amendment violated Act 250 Rule 34(E).  Rule 34(E) was codified after we issued our decision in In re Stowe Club Highlands, 166 Vt. 33, 687 A.2d 102 (1996).  In that case, this Court considered the circumstances under which permit conditions may be modified.  Id. at 37, 687 A.2d at 105.  We validated the Environmental Board's framing of the discussion as "weighing the competing values of flexibility and finality in the permitting process."  Id. at 38, 687 A.2d at 105.  On the "flexibility" side of the ledger, we noted, "If existing permit conditions are no longer the most useful or cost-effective way to lessen the impact of development, the permitting process should be flexible enough to respond to the changed conditions."  Id.  We acknowledged that "changes in factual or regulatory circumstances beyond the control of the permittee," unforeseeable changes in the "construction or operation of the permittee's project," and "changes in technology" were among the kinds of changes to be considered.  Id.  On the "finality" side, we acknowledged that "parties and other interested

    [4]  The Natural Resources Board (NRB) intervened in September 2014 pursuant to 10 V.S.A. § 8504(n)(3).  After intervening, the NRB moved for summary judgment essentially supporting the City's position.  On appeal, the NRB advocates that we affirm the Environmental Division's award on largely the same grounds as the City.  Accordingly, we consider the NRB's motion in conjunction with the City's motion.

persons rely on permit conditions designed to mitigate the impact of proposed developments." Id. at 39, 687 A.2d at 106. This Court deferred to the Board to develop more specific standards to guide applications for permit amendments. Id. at 38, 687 A.2d at 105.

¶ 12. The Board did adopt more specific standards in Act 250 Rule 34(E). That Rule, which lays out what it identifies as the "Stowe Highlands Analysis," provides:

> (1) In reviewing any amendment application, the district commission shall first determine whether the applicant proposes to amend a permit condition that was included to resolve an issue critical to the issuance of the permit.
> . . .
>
> (2) In reviewing an application seeking to amend a condition that was included to resolve an issue critical to the issuance of the applicable permit, the district commission shall consider whether the permittee is merely seeking to relitigate the permit condition or to undermine its purpose and intent.
>
> (3) If the application proposes to amend a permit condition that was included to resolve an issue critical to the issuance of a permit and is not merely seeking to relitigate the permit condition, the district commission shall apply the balancing test set forth in subsection (4) below. If the . . . need for finality outweighs the need for flexibility, the district commission shall deny the permit amendment application. In the alternative, the district commission may rule in favor of flexibility.
>
> (4) In balancing flexibility against finality, the district commission shall consider the following, among other relevant factors:
>
>> (a) changes in facts, law or regulations beyond the permittee's control;
>>
>> (b) changes in technology, construction, or operations which necessitate the need for an amendment;
>>
>> (c) other factors including innovative or alternative design which provide for a more efficient or effective means to mitigate the impact addressed by the permit condition;
>>
>> (d) other important policy considerations, including the proposed amendment's furtherance of the goals and objectives of duly adopted municipal plans;

7

(e) manifest error on the part of the district commission, the environmental board, or the environmental court in the issuance of the permit condition; and

(f) The degree of reliance on prior permit conditions or material representations of the applicant in prior proceeding(s) by the district commission, the environmental board, the environmental court, parties, or any other person who has a particularized interest protected by 10 V.S.A. Ch. 151 that may be affected by the proposed amendment.[5]

¶ 13. Neighbor makes two arguments with respect to Rule 34(E).[6] First, neighbor challenges the trial court's conclusion that the City was not merely trying to relitigate Condition #19. Second, neighbor contends the trial court did not properly balance finality with flexibility.

¶ 14. We review the trial court's summary judgment ruling anew and without deference, applying the same standard as the Environmental Division. In re Times & Seasons, LLC, 2011 VT 76, ¶ 8, 190 Vt. 163, 27 A.3d 323.[7]

---

[5] In December 2015, the Act 250 Rules were amended, and subsection (2) of Rule 34(E) was deleted. The NRB indicated in its explanation of the amendments that the "mere relitigation" test in subsection (2) requires consideration of the factors in the balancing test contained in what was formerly subsection (4). In deciding this dispute, we rely on the prior version of Rule 34(E), because this was the version of the rule in effect at the time of the dispute. As a consequence, our two-step analysis under the prior version of the rule relies on largely overlapping considerations.

[6] Neither party challenges the trial court's finding that Condition #19 was critical to the issuance of the 1994 Permit. Therefore, we assume that criterion has been satisfied.

[7] We note that the proper standard of review is not entirely clear. Although the trial court resolved this matter on summary judgment, its decision refers to various undisputed facts as "findings of fact," and on appeal the parties reference the trial court's factual findings. The City argues that we should review the trial court's determination deferentially, and at oral argument, neighbor acknowledged that this case is more akin to a ruling on the merits based on stipulated facts. Whether applying the Act 250 Rule 34(E)(4) balancing test to the undisputed facts is an application of the law that is subject to non-deferential review or an exercise of factfinding subject to deference is an open question. Compare Monge v. Maya Magazines, Inc., 688 F.3d 1164, 1170, 1173-83 (9th Cir. 2012) (applying de novo review to trial court's summary judgment based on balancing of factors under fair use defense to copyright infringement) and Gregory v. Beazer East, 892 N.E.2d 563, 578 (Ill. App. Ct. 2008) (explaining that trial court's choice-of-law determination is reviewed de novo because "the task of evaluating and balancing the choice-of-law factors . . . is a matter of law rather than [] of fact"), with Crum & Forster

8

I. Relitigation of Prior Permit

¶ 15. Neighbor argues the trial court erred in concluding the City was not merely trying to relitigate Condition #19 because in connection with the 2012 application to amend the permit the City relied on circumstances it knew or could have foreseen back in 1994.

¶ 16. We have recognized that requests to amend permits on the basis of small or moderate changes in circumstances are ordinarily disfavored, while amendment applications based on more extreme changes may not be. In Stowe Club Highlands, we stated: "Permit applicants should consider foreseeable changes in the project during the permitting process, and not suggest conditions that they would consider unacceptable should the project change slightly. Otherwise, the initial permitting process would be merely a prologue to continued applications for permit amendments." 166 Vt. at 39, 687 A.2d at 106. We further explained that, "while small or moderate changes are expected and even common, extreme changes will likely come as a surprise to all involved." Id. at 39, 687 A.2d at 106.

¶ 17. We conclude that the changes in and around the Park since 1994 have been so extensive that it would be improper to characterize the City's application as a mere effort to relitigate the 1994 permit, or to undermine the purposes of the conditions in that permit. In 1994, the City did have plans for development in and around the Park. At the time of the 1994 Permit proceedings, the City noted: "[T]he Waterfront is an extremely dynamic area at this point in time. There is no question that there will be an expansion of both commercial and residential development in the area." However, the evolution and realization of the City's goals has led to a

---

Specialty Ins. Co. v. Creekstone Builders, Inc., __ S.W.3d. __, __, 2015 WL 6488276, at *4 (Tex. App. 2015) (holding that when trial court has considered all relevant factors in its forum non conveniens analysis, "the court's ruling deserves substantial deference," and appellate court should not conduct de novo review "by reweighing each of the factors" (quotation marks omitted)). Because we reach the same conclusion as the trial court even affording its ruling no deference, the resolution of this case does not turn on the applicable standard of review.

transformation that cannot be characterized as "small or moderate." Stowe Club Highlands, 166 Vt. at 39, 687 A.2d at 106.

¶ 18. Since the Park's inception, it has undergone dramatic changes, with such notable additions as the ECHO Lake Aquarium and Science Center, Union Station, and Main Street Landing. At the time of the 1994 permit proceedings, the City had only just begun to use the Park as a venue for public events. Since that time, the Park has grown from hosting thirteen events in the summer of 1993, to hosting multiple events throughout the year, generating millions of dollars in local revenue and drawing over 185,000 visitors to the Park and downtown Burlington. Festivals and other events at the Park have become a central element of City and regional cultural life, and most City residents have identified increasing the number of events in the Park as a top priority. The City's plans to grow and support the downtown economy depend in part on increasing public use of the Park, including hosting events all four seasons of the year. In short, the changes to the Park have been anything but "expected and common." Id.

¶ 19. As the trial court correctly observed, "[f]oresight alone does not overcome the conclusion" that circumstances might change to such a degree that an amendment is warranted. The fact that the City had ambitious aspirations for the Park in 1994 does not render the realization of its goals a "moderate change[]" and foreseeable outcome. Stowe Club Highlands, 166 Vt. at 39, 687 A.2d at 106. The City hoped for a robust waterfront that would serve as a focal point for the community and the region. The extent of its success in achieving these hopes was not so foreseeable at the time of the 1994 Permit that the City was forever precluded from seeking amendments to the permit if its hopes were realized. We agree with the Environmental Division's conclusion that in seeking to amend the permit, the City is not merely seeking to relitigate matters resolved in 1994.[8]

---

[8] We note several factors that support the Environmental Division's conclusion on this point with respect to the regulation of sound levels in particular. As noted more fully below,

10

II. Balancing Finality and Flexibility

¶ 20.    Neighbor also argues that Environmental Division incorrectly balanced the need for flexibility over finality in concluding that an amendment to Condition #19 was warranted and that each of the pertinent factors weighs in favor of affirming the finality of the 1994 permit.

¶ 21.    Although we conclude that one factor—others' reliance on the prior permit conditions—weighs in favor of finality, we agree with the trial court that the weight of the relevant factors tips in favor of flexibility in this case.

¶ 22.    The first three factors—relating to intervening changes, including changes in facts, laws, technology, and innovative design between when Condition #19 was imposed and when the permit amendment was requested—favor flexibility.  See Act 250 Rule 34(E)(4)(a)-(c).  Two main categories of changes support the City's request to revisit the condition.

¶ 23.    One set of changes, already described more extensively above, involves changes in the City's use of the Park and in the number and location of surrounding residential and commercial structures.  Given the extent of these changes, and the more central role that the Park has come to play in the social, cultural, and economic life of the City, we agree with the Environmental Division that it is appropriate to revisit whether Condition #19, including its limitations on the number and times and dates of events, is the most effective way to mitigate any adverse impacts events at the Park may cause.

¶ 24.    We reject neighbor's argument that these changes carry no weight because they were not beyond the City's control.  As noted above, although the City planned for a robust Park, successful realization of that plan required a confluence of different factors, including intense community engagement, investment by private developers, and the efforts of myriad event

---

Condition #19(e) was inherently ambiguous insofar as it did not indicate the method by which the sound levels were to be measured.  Moreover, significant developments in the measurement and regulation of sound levels, and in scientific understanding of the health effects of varying sound levels, support the conclusion that the City's 2012 amendment application did not merely seek a second bite at the apple on this issue.  See infra, ¶ 26.

11

planners and guests who helped transform the Park into a social, cultural and recreational focal point for the City.

¶ 25.    Another set of changes supporting consideration of the City's application to amend Condition #19 involves the regulation and measurement of sound levels.  The limitations in the 1994 permit are ambiguous; although they restrict sound to eighty-five decibels at the perimeter of the Park nearest the source of the sound and seventy-five decibels at the eastern edge of Lake Street adjacent to any residential or commercial property, they do not specify whether the restrictions limit the instantaneous decibel readings, or the average.  See In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 77, __ Vt. __, 121 A.3d 630 (recognizing distinction between Lmax measurement, which measures instantaneous noise, and Leq(n), which measures maximum noise level averaged over a period of time (n)).  At a minimum, the ambiguity in the prior permit condition called for clarification.  Moreover, adoption of the proposed $Leq_{event}$ metric (equivalent continuous sound pressure level over the course of the event) and the LAfmax metric (maximum fast-response sound pressure) would allow comparison with community noise guidelines published by the World Health Organization (WHO).  These WHO guidelines, published in 2000, provide a scientific basis for ascertaining noise levels that cause "serious annoyance" and "sleep disturbance."  These guidelines were not available in 1994, and they form the basis for the City's proposed amendments to Condition #19(e).[9]

¶ 26.    The fourth factor, focusing on policy considerations, "including the proposed amendment's furtherance of the goals and objectives of duly adopted municipal plans," most

---

[9] In her reply brief, neighbor argues against the merits of the City's proposed amendments to the sound restrictions in the 1994 permit on the basis that the proposed amendments do not further mitigate the sound impacts of events in the Park but instead allow for higher levels of noise.  We do not address the question of whether the City's proposed sound limits are sufficient to mitigate any otherwise undue adverse noise impact from events in the Park pursuant to Act 250 standards.  The question before us, and the only question we resolve in this decision, is whether, under Rule 34(E), the City is entitled to seek an amendment of the condition.

12

strongly supports flexibility in this case. Act 250 Rule 34(E)(4)(d). As noted above, the City's plans call for maximizing the use of the Park for festivals and special events. The fact that the property in question is publicly owned, and is dedicated to public use, further enhances the weight assigned to this factor.

¶ 27. The fifth factor—manifest error in the original permitting process—is a wash. Act 250 Rule 34(E)(4)(e). There is no evidence of any "manifest error" on the part of the district commission in issuing the 1994 permit. Act 250 Rule 34(E)(4)(e). On the other hand, as noted above, Condition #19(e) contained ambiguities that merited clarification.

¶ 28. The final factor—reliance by others on the terms of the permit—points in favor of finality. See Act 250 Rule 34(E)(4)(f) (citation omitted). Neighbor, and no doubt others who live by the Park, have relied on the prior permit conditions, including the limits on the frequency and dates of events and on sound levels. The City's proposed changes will unquestionably affect neighbor's interests. On appeal, the City argues that the following language in Condition #19 renders any reliance by neighbor unreasonable: "The following rules shall apply to events held in the Park, unless the permittee secures written permission from the District Commission to change these rules." The fact that permit conditions may be amended does not mean neighbors cannot ever reasonably rely on the conditions in a permit. As we noted in Stowe Club Highlands, "parties and other interested persons rely on permit conditions designed to mitigate the impact of proposed developments." 166 Vt. at 39, 687 A.2d at 106. While this reliance does not defeat any proposed amendment, it is factor in the balance. As in Stowe Club Highlands, neighbor benefitted from Condition #19, and it was reasonable for her to rely on Condition #19 in purchasing her home. Id. at 40, 687 A.2d at 106-07.

¶ 29. On balance, and for the reasons set forth above, we agree with the Environmental Division's conclusion that the factors supporting flexibility in this case outweigh those calling for finality. The Park has been a dynamic resource to the City, and its increased use has been

and will continue to be important to the City's cultural, recreational and social life, and its prosperity.  While neighbor's reliance on the prior permit limitations carries some weight, in this case it is outweighed by other factors so that it is not unreasonable to consider proposed amendments to the permit.[10]

    <u>Affirmed</u>.

FOR THE COURT:

_____

Associate Justice

---

[10]  Having found that Rule 34(E) does not preclude the City from seeking an amendment, we do not address the City's argument that neighbor is precluded from challenging the City's ability to seek a permit amendment on account of a settlement and stipulation reached between the parties in a related matter.