VERMONT SUPERIOR COURT
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org

ENVIRONMENTAL DIVISION
Docket No. 24-ENV-00005



| Green Mountain Dog Camp, LLC | DECISION ON MOTIONS |
|---|---|

In this action, Janine Mannien d/b/a Green Mountain Dog Camp, LLC (Applicant) appeals a December 28, 2023 Decision by the District 5 Environmental Commission (District Commission) denying her application for a permit amendment of Land Use Permit #5W0914 (LUP #5W0914) for an as-built dog training and doggie daycare at her property located at 2545 Winch Hill Road, Roxbury, Vermont (the Property). Presently before the Court are cross-motions for summary judgment filed by Applicant, the Vermont Natural Resources Board (NRB), and interested persons Jean Henry and Casimir Vaicaitis (together, Neighbors).

## Legal Standard

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2). When considering a motion for summary judgment, the nonmoving party receives the benefit of all reasonable doubts and inferences. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356. When considering cross-motions for summary judgment, the Court considers each motion individually and gives the opposing party the benefit of all reasonable doubts and inferences. City of Burlington v. Fairpoint Commc'ns, Inc., 2009 VT 59, ¶ 5, 186 Vt. 332. In determining whether there is a dispute over any material fact, "we accept as true allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." White v. Quechee Lakes Landowners' Ass'n, Inc., 170 Vt. 25, 28 (1999) (citation omitted); V.R.C.P. 56(c)(1)(A).

**Statement of Questions**

Applicant raises three Questions in her Statement of Questions. They ask:

> 1. When balancing the seven finality and flexibility factors of Act 250 Rule 34(E)(4)(b)(d)(e), do the factors weigh in favor of granting flexibility to amend the permit to allow for the [Project's] activities?
>
> 2. Does the [Project] have an undue adverse effect, or a significant or destructive impact on necessary wildlife habitat, under 10 VSA 6086(a)(8)(A)?
>
> 3. Do the factors under 10 V.S.A. 6086(a)(8)(A)(i-iii) weigh in favor of finding no undue adverse effect on necessary wildlife habitat under Act 250 Criterion 8(A)?

Statement of Questions (filed on Mar. 19, 2024).

**Factual Background**

We recite the following facts solely for the purposes of deciding the pending cross-motions. These facts do not constitute factual findings because factual findings cannot occur until after the Court conducts a trial. Fritzeen v. Trudell Consulting Eng're, Inc., 170 Vt. 632, 633 (2000) (mem).

Additionally, we note that Applicant did not respond to the NRB or Neighbors' statements of undisputed material facts. The NRB and Neighbors, in turn, did not reply to each other's statements. When a party fails to address another party's factual statement, in whole or in part, the Court may, among other things, "consider the facts undisputed for the purposes of the motion" or "grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it . . . ." V.R.C.P. 56(e)(2)–(3). With this in mind, the Court finds the following facts undisputed for the purposes of the pending motion unless otherwise noted based on the parties statements of undisputed material facts, and responses thereto as well as V.R.C.P. 56(e)(2), and the record before the Court pursuant to V.R.C.P. 56(e)(3).

1. Janine Mannien owns property having an address of 2545 Winch Hill Road, Roxbury, Vermont (the Property).

2. Ms. Mannien does business as Green Mountain Dog Camp, LLC (together, Applicant).

3. Applicant operates a dog training and daycare facility at the Property.

4. Applicant's relevant operations include the dog daycare and training use along with "three, 6.5-foot tall, plastic, fenced dog runs, 5 kennels, an 8'x12' lean-to for shelter during storms and small heat source in winter, and a 625 square foot dog training center with grooming tub inside a converted garage." NRB Ex. 1 (together, the Project).

5. The Property consists of two lots, Lots 8 and 9 of the Winch Hill Subdivision.

2

6. The Winch Hill Subdivision was created by Land Use Permit (LUP) #5W0914, issued February 18, 1987.

7. The Property is subject to LUP #5W0914.

8. Condition 1 of LUP #5W0914 states:

> The project shall be completed and maintained as set forth in Findings of Fact and Conclusions of Law 5W0914, in accordance with the plans and exhibits on file with the District Environmental Commission, and in accordance with the conditions of this permit. No changes shall be made in the project without written approval of the District Environmental Commission.

NRB Ex. 2 (LUP #5W0914).

9. Condition 2 reiterates that the permit runs with the land and will be binding on all assigns and successors in interest. Id.

10. Condition 12 states that:

> Prior to the sale of any lots, the permittee shall work with the Department of Fish and Wildlife to finalize the forestry management plan described in the Exhibits and attached Findings of Fact. The completed plan shall be binding on all affected lot owners during the life of this permit and any proposed changes in the plan shall be subject to prior Commission review and approval in the form of an amended land use permit.

Id.

11. In the Findings of Fact and Conclusions of Law, the permit states:

> This 230± acre tract is characterized by overgrown pastures and woodlands. The Department of Fish and Wildlife [has] identified significant deer wintering habitat on substantial portions of the tract (Exhibits 8 and 18) and during the hearing the Department indicated that lots 5, 6, 7, 10, 11 and 23 were most affected. The applicant is to be applauded for its efforts to preserve these habitat and forestry resources by placing conservation easement [sic] over 60% of the proposed subdivision, restricting activity to limited forest management. (Exhibits 3 and 16). A draft of the conservation easement is set out on Exhibit 13 and includes lots 1, 2 and 5 through 15. An actual forest management plan will be devised with input from the Department and this Commission shall be provided a copy of the final plan for its review and concurrence. The Commission notes that there will not be direct public access to the conservation zones through the developed portions of the lots but that such access may continue from adjoining properties for hunting and recreational purposes. In closing, the Commission indicates that the forest management plan is an integral part of its affirmative findings under this criterion [8] as to habitat and under 9(C) as to forestry soils. This plan shall be binding

3

> during the life of the land use permit and any changes in the plan, as a result of proposed actions by a lotowner(s) shall be subject to prior Commission review and approval by means of an amended land use permit.

Id. at 11 (emphasis added)

12. LUP #5W0914, through Condition 1, incorporates exhibits provided in support of the subdivision application.

13. Exhibit 3 to LUP #5W0914 is an overview of the subdivision application which includes the following representations:

> Over 60% of the subdivision will have a conservation easement placed on it which will restrict activity to limited forest management. . . . A deer wintering area has been identified on the lower western side of the subdivision. This area will be included in the forest management zone.

NRB Ex. 3 at 1.

14. The subdivision application additionally represented that "[o]nly limited tree cutting will be permitted in accordance with a forest management plan to be provided [sic] each land owner." NRB Ex. 4 at 3.

15. This limitation on construction and activities within the forest management zone was reiterated in a letter to the Agency of Natural Resources (ANR) regarding the subdivision. NRB Ex. 6.

16. With respect to deer wintering areas, the subdivision application represented that the identified area "will be protected through the use of the conservation easement and the restrictions on activities." Id. at 4.

17. The subdivision application made numerous representations to the District Commission regarding the limitations on tree cutting and erection of structures within the conservation areas and the protection of deer wintering habitat.

18. The subdivision application also included proposed deed restrictions for the subdivided lots. These restrictions included:

> a. "No temporary structures shall be constructed upon any lot in the development.
> b. "All dogs must be confined or leashed."
> c. "No construction of any kind will be permitted in [the forest management conservation easement] zone."

NRB Ex. 11.

19. Applicant's deed references the conservation easement (the Conservation Easement) and its terms, as recorded in the Town of Roxbury Town Clerk's Office. NRB Ex. 10; Applicant Ex. O.

20. The Conservation Easement states that "forest management will be conducted in accordance with the guidelines put forth in the Winch Hill Forest Conservation Zone Management Plans developed by the Patten Environmental Trust and the Vermont Department of Fish and Game." NRB Ex. 11.

21. The conservation easement further restricts use, alteration, and construction in the easement as follows:

> Recreational activities such as hiking, cross-country skiing, picnicking and hunting are encouraged. The use of snowmobiles and all-terrain vehicles shall be restricted to existing trails. Construction and maintenance of new trails is permitted only after consultation, review, and approval in writing by the Patten Environmental Trust and officials of the Vermont Fish and Game Department.

> Timber and brush cutting is allowed only in accordance with the Forest Management Plan on file with the Roxbury Town Clerk and held by each lot owner. No alteration or construction within the Forest Conservation Zone, except as specified in the Forest Management Plan or otherwise provided for herein, is allowed.

> * * *

> Constructing and maintaining foot trails for recreational purposes is allowed. The location of such trails is subject to approval in writing by the Patten Environmental Trust.

Id.

22. Parts of the forest conservation easement are located on the Property.

23. In 2002, the forest management plan incorporated into LUP #5W0914 was created (the Forest Management Plan). NRB Ex. 13.

24. The Project is adjacent to mapped deer wintering habitat and areas subject to the Forest Management Plan and Conservation Easement and may impact the protected habitat's function.[1]

25. In 2022, Applicant conducted a timber harvest at the Property.

26. On July 29, 2022, Appellant filed LUP Application #5W0194-2 for the "as-built" Project.

---

[1] It is disputed whether a portion of the Project is within areas subject to the Forest Management Plan that Applicant either cut or otherwise uses in relation to the Project. Applicant disputes whether the Project is in the area, but the record shows that ANR representatives observed portions of the Project within a portion of the conservation easement zone. This dispute is not material because it is undisputed that the Project is at a minimum adjacent to portions of the Property subject to the Forest Management Plan and at least has the potential to impact the deer wintering areas that it was imposed to protect.

27. On December 28, 2023, the District Commission dismissed the application on the grounds that Applicant was not entitled to amend LUP #5W0914.

28. Applicant timely appealed to this Court.

## Discussion

Prior to addressing the merits of the motion, the Court notes the applicable burdens of proof in both this case, generally, and on the pending motions. Pursuant to 10 V.S.A. § 6088, the applicant always carries the initial burden of production in an Act 250 case. Applicant also bears the burden of proving that a permit amendment application satisfies the Stowe Club Highlands test. Re: Dr. Anthony Lapinsky & Dr. Colleen Smith, Nos. 5L1018-4, 5L0426-9-EB, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Div. Oct. 3, 2003). Lastly, the party moving for summary judgment has the burden of proof with respect to establishing sufficient material facts for the Court to rule on the pending motion. Couture v. Trainer, 2017 VT 73, ¶ 9, 205 Vt. 319 (quoting Price v. Leland, 149 Vt. 518, 521 (1988)).

I.      **Act 250 Rule 34(E)**

The central issue in this case and the pending motions is whether Applicant is entitled to a permit amendment of LUP #5W0914 for the Project.

Act 250 Rule 34(E) codifies the Vermont Supreme Court's analysis set forth in In re Stowe Club Highlands. 166 Vt. 33, 38—40 (1996); Act 250 Rules, Rule 34(E). Rule 34(E) and Stowe Club Highlands may preclude an applicant from amending conditions in a final and binding Act 250 land use permit. Id. One of the goals of this limitation is to ensure that the issuance of an Act 250 permit is not "merely a prologue to continued applications for permit amendments." Stowe Club Highlands, 166 Vt. at 39.

When, however, there is a justification for an amendment application, the District Commission, and this Court on appeal, must consider whether the proposed amendments comply with Act 250. In re Waterfront Park Act 250 Amendment, No. 138-9-14 Vtec, slip op. at 4—5 (Vt. Super. Ct. Envtl. Div. May 8, 2015) (Walsh, J.) *aff'd by* 2016 VT 39. This flexibility reflects the recognized fact that "Act 250 permits are written on paper, not carved in stone, and the relitigation concepts embodied in [Rule] 34(E)(2) cannot be considered unconditionally ironclad, as, in some sense, every permit amendment application is a relitigation of an initial permit condition." Re: Dr. Anthony Lapinsky & Dr. Colleen Smith, Nos. 5L1018-4, 5L0426-9-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Div. Oct. 3, 2003).

When reviewing a permit amendment application, this Court employs a stepped analysis of its merit. First, we focus on the nature of the permit condition the application seeks to amend. Specifically, "whether the applicant proposes to amend a permit condition that was included to resolve an issue critical to the issuance of the permit." Act 250 Rules, Rule 34(E)(1). This determination is done on a case-by-case basis. Id. If the condition was not included to resolve a critical issue, then the applicant is entitled to seek amendment thereof. Act 250 Rules, Rule 34(E)(1)(a).

If, however, the condition was critical to the permit's issuance, also referred to as a "critical permit condition," we move to the next step of our analysis. At this stage, we weigh the competing goals of finality and flexibility. We do this by looking to the following list of enumerated factors:

> (a)      changes in facts, law or regulations beyond the permittee's control;
> (b)      changes in technology, construction, or operations which necessitate the amendment;
> (c)      other factors including innovative or alternative design which provide for a more efficient or effective means to mitigate the impact addressed by the permit condition
> (d)      other important policy considerations, including the proposed amendment's furtherance of the goals and objectives of duly adopted municipal plans;
> (e)      manifest error on the part of the District Commission, the environmental board, or the environmental court in the issuance of the permit condition; []
> (f)      the degree of reliance on prior permit conditions or material representations of the applicant in prior proceeding(s) by any party, the District Commission, the environmental board, the environmental court, or any other person who has a particularized interest protected by 10 V.S.A. Ch. 151 that may be effected by the proposed amendment[; and]
> (g)      whether the applicant is merely seeking to relitigate the permit condition or to undermine its purpose and intent.

Act 250, Rule 34(E)(3)(a)-(g).

## II.      Critical Permit Condition

LUP #5W0914 contains numerous conditions, supporting representations, and exhibits. Relevant here are Conditions 1 and 12, along with the associated Findings of Fact and Conclusions of Law, and exhibits.

Condition 1 of LUP #5W0914 states:

> The project shall be completed and maintained as set forth in Findings of Fact and Conclusions of Law 5W0914, in accordance with the plans and exhibits on file with the District Environmental Commission, and in accordance with the conditions of this permit. No changes shall be

made in the project without written approval of the District Environmental Commission.

NRB Ex. 2.

Condition 12 states that:

> Prior to the sale of any lots, the permittee shall work with the Department of Fish and Wildlife to finalize the forestry management plan described in the Exhibits and attached Findings of Fact. The completed plan shall be binding on all affected lot owners during the life of this permit and any proposed changes in the plan shall be subject to prior Commission review and approval in the form of an amended land use permit.

Id.

Finally, in the Findings of Fact and Conclusions of Law, the permit states:

> This 230± acre tract is characterized by overgrown pastures and woodlands. The Department of Fish and Wildlife [has] identified significant deer wintering habitat on substantial portions of the tract (Exhibits 8 and 18) and during the hearing the Department indicated that lots 5, 6, 7, 10, 11 and 23 were most affected. The applicant is to be applauded for its efforts to preserve these habitat and forestry resources by placing conservation easement [sic] over 60% of the proposed subdivision, restricting activity to limited forest management. (Exhibits 3 and 16). A draft of the conservation easement is set out on Exhibit 13 and includes lots 1, 2 and 5 through 15. An actual forest management plan will be devised with input from the Department and this Commission shall be provided a copy of the final plan for its review and concurrence. The Commission notes that there will not be direct public access to the conservation zones through the developed portions of the lots but that such access may continue from adjoining properties for hunting and recreational purposes. In closing, <u>the Commission indicates that the forest management plan is an integral part of its affirmative findings under this criterion [8] as to habitat and under 9(C) as to forestry soils. This plan shall be binding during the life of the land use permit and any changes in the plan, as a result of proposed actions by a lotowner(s) shall be subject to prior Commission review and approval by means of an amended land use permit.</u>

Id. (emphasis added).

Condition 12, which required the creation and implementation of a forest management plan binding on all lot owners is, by the terms of the Findings of Fact and Conclusions of law, a critical permit condition. LUP #5W0914 explicitly states that the forest management plan was "<u>an integral part</u>" of the District Commission's conclusions under Criteria 8 and 9(C). The terms of LUP #5W0914 could not be more explicit. LUP #5W0914 explicitly states that changes to the forest

8

management plan must receive review and approval through an amended land use permit. Condition 12 and the associated forest management plan conditions, intended to protect and preserve deer wintering habitat, are critical permit conditions.

Applicant asserts that the Project does not seek amendment of this permit condition or any aspect of the Conservation Easement, Forest Management Plan or any other contemplated forest management restrictions on the Property created by LUP #5W0914 because she is in "compliance" with them.[2] This assertion is not supported by any evidence before the Court. Rather, Applicant's assertion ignores Conditions 1 and 12 and the Findings of Fact and Conclusions of Law, which restrict activity within the forest management area to limited forestry management.[3] Applicant does not dispute that the Project as built is at a minimum adjacent to protected areas and has the potential to impact the purpose of the forest management plan, the protection of deer wintering habitat.[4] This is apparent from the steps Applicant proposes as mitigation measures to limit, but not eliminate, impacts to the deer wintering area from the Project. Because the Project seeks to allow impacts not contemplated by LUP #5W0914 and which are outside the scope of its terms and the imposition of Condition 12, Applicant seeks to amend a critical permit condition.

Neighbors also argue that LUP #5W0914 limits the allowed uses in the subdivision to residential use only. This is based on the fact that LUP #5W0914 was specific to the residential subdivision and contains numerous references to the residential nature of the application. Neighbors assert that these references and defined scope of the subdivision application make the residential nature of the subdivision a critical permit condition. Thus, because the Project is a commercial development, they assert it conflicts with these critical conditions. Because we conclude that the application seeks amendment of Condition 12, a critical permit condition, and for the reasons set forth

---

[2] To the extent that Applicant argues that the application does not seek amendment of any permit condition because LUP #5W0914 does not prohibit home-based businesses, this assertion ignores Condition 12 and the associated land use limitations and their overarching purposes.

[3] The Court further notes that Applicant's Statement of Questions does not appear to challenge the fact that the application seeks to amend a critical permit condition. Instead, the sole Question concerning whether Applicant is entitled to seek an amendment addresses the factors the Court weighs in determining whether flexibility outweighs finality. The Court only reaches this step of the permit amendment analysis once it concludes that the at-issue application seeks amendment of a critical permit condition. See Act 250 Rules, Rule 34(E)(2). Thus, the issue of whether the application seeks amendment of a critical permit condition is not directly before the Court as an issue raised in Applicant's Statement of Questions. See In re Garen, 174 Vt. 151, 156 (2002). To the extent, however, the issue is intrinsic to Question 2, the Court addresses it. In re LaBerge NOV, 2016 VT 99, ¶ 15, 203 Vt. 98 (citing In re Jolley Assocs., 2006 VT 132, ¶ 9, 181 Vt. 190).

9

below, the Court need not address whether LUP #5W0914's statements regarding the residential nature of the subdivision are, themselves, critical permit conditions.

## III. Finality versus Flexibility

Having determined that the application seeks amendment of a critical permit condition, we turn to the relevant factors to consider when determining whether finality outweighs flexibility, or visa versa.

Pursuant to Rule 34(E), these factors are:

>  (a) By changes in facts, law or regulations beyond the permittee's control;
>  (b) changes in technology, construction, or operations which necessitate the amendment;
>  (c) other factors including innovative or alternative design which provide for a more efficient or effective means to mitigate the impact addressed by the permit condition
>  (d) other important policy considerations, including the proposed amendment's furtherance of the goals and objectives of duly adopted municipal plans;
>  (e) manifest error on the part of the District Commission, the environmental board, or the environmental court in the issuance of the permit condition; []
>  (f) the degree of reliance on prior permit conditions or material representations of the applicant in prior proceeding(s) by any party, the District Commission, the environmental board, the environmental court, or any other person who has a particularized interest protected by 10 V.S.A. Ch. 151 that may be effected by the proposed amendment[; and]
>  (g) whether the applicant is merely seeking to relitigate the permit condition or to undermine its purpose and intent.

Act 250, Rule 34(E)(3)(a)-(g).

Each factor is addressed in turn.

### (a) Changes of facts, law, or regulations beyond permittee's control.

Applicant appears to argue that the 1999 Department of Fish & Wildlife Guidelines for the Review & Mitigation of Impacts to White-Tailed Deer Winter Habitat (the 1999 DFW Guidelines) have been amended such that the Project is consistent therewith. This is based on this Court's holding in In re Ashford Land HOA Act 250 Application, No. 69-5-13 Vtec (Vt. Super. Ct. Envtl. Div. Dec. 6, 2013) (Walsh, J.). Ashford concerned an Act 250 permit condition in which dogs, generally, were wholly banned from a subdivision and the decision was based in part on the 1999 DFW Guidelines as it related to domestic dogs. No such condition exists in LUP #5W0914 and supporting documents

for that application show that domestic dogs are contemplated to be within the subdivision, provided they are leashed or confined.

Further, the 1999 DFW Guidelines, as cited in Ashford and by Applicant in the pending motion, recognize that domestic dogs, even outside the deer wintering area, have impacts on the habitat. It contains suggested language for model covenants to mitigate impacts from domesticated dogs within residential subdivisions. It states:

> Each landowner is hereby put on notice that this development is in the immediate vicinity of a deer wintering area. Domestic dog activity seriously jeopardizes this critical habitat and the existence of the deer in this area. A person who owns a dog that is not leashed, kenneled or otherwise under the owner's immediate control is subject to the penalties of 10 V.S.A. section 4748 (Dogs Pursuing Deer) and section 4514 (Possession of Flesh of Game).

1999 DFW Guidelines at 7 (filed as NRB Ex. 19).

As such, Ashford, concerning a complete prohibition on dogs in a residential subdivision, and the 1999 DFW Guidelines, which specifically state that domestic dogs in areas even outside, but in the vicinity of, deer wintering areas seriously jeopardize the habitat, do not weigh in favor of flexibility. This is particularly true when, while it is disputed whether Applicant operates within current or former deer wintering habitat, it is undisputed that Applicant's operations are adjacent thereto.

Applicant presents no other changes in fact, law or regulation that were beyond Applicant's control that would weigh in favor of flexibility. Thus, we conclude this factor weighs in favor of finality.

**(b) Changes in technology, construction, or operations which necessitate the amendment.**

Applicant points to no changes in technology, construction, or operations that themselves necessitate the amendment. This is because she points to no factors outside of her control that would weigh in favor of flexibility.[5] Thus, this factor weighs in favor of finality.

**(c) Other facts including innovative or alternative design which provide for a more efficient or effective means to mitigate the impact addressed by the permit condition.**

Applicant has noted that she's adopted a series of operational changes that she asserts mitigate the impact from the Project on the deer wintering areas. These include, generally, limitations and rules for dog walking, service changes and limited hours of operations, relocating and resizing the outside doggie daycare area, imposing training and bark e-collar requirements, and staff changes and training.

---

[5] Applicant does point to changes in her as-built operations and devices she can use that she asserts would mitigate or minimize impacts from the Project and, presumably, the impact addressed by the Condition 12. We address these assertions under subsection (c), where they are better suited than subsection (b).

11

These proposed operational changes are not a "more efficient or effective means" to mitigate impacts to the deer wintering area protected by Condition 12. Instead, the changes are means to mitigate the as-built Project, which has its own impacts not contemplated by Condition 12 when proposed. Thus, the changes do not propose to mitigate impacts from the residential subdivision more effectively than Condition 12 but instead they seek to mitigate a previously uncontemplated use, with uncontemplated impacts on the deer wintering area Condition 12 seeks to protect. See e.g., In re Costco Land Use Act 250 Permit Amendment, No. 20-3-20 Vtec, slip op. at 8 (Vt. Super. Ct. Envtl. Div. Aug. 31, 2021) (Durkin, J.) (concluding that subsection (c) weighed in favor of finality when proposed project changes did not seek to more effectively mitigate at-issue impacts and that operational changes may create their own impacts).[6]

Thus, Applicant's as-built proposed mitigation measures for the Project do not weigh in favor of flexibility and we conclude that subsection (c) therefore weighs in favor of finality.

**(d) Other important policy considerations, including the proposed amendment's furtherance of the goals and objectives of duly adopted municipal plans.**

Applicant argues that at all relevant times the Town of Roxbury Town Plan has supported home businesses in the town generally and within the Property's district. The current Town Plan, however, contains additional language that was not present in the Town Plan effective at the time of LUP #5W0914 in which it calls for prioritizing habitat protection, with specific reference to deer wintering habitat and development adjacent thereto. See Applicant Ex. N at 17 ("Deer annually migrate to areas which provide protection from harsh winter conditions . . . Development within or adjacent to these [deer] wintering areas ultimately decreases the ability of the land to support deer."); id. at 58 ("Action . . . [p]rotect critical wildlife habitat (deer wintering areas . . . )."). Applicant does not address or contest this language or otherwise provide an understanding as to how or why the provisions related to home businesses interrelate with the clear goals of protecting deer wintering habitat.

Thus, even if the Court were to conclude that the Project would further the Town Plan's objectives of supporting home businesses, it would run counter to its stated goals of protecting and prioritizing deer wintering habitat protection because the Project will impact the habitat. In this case, where deer wintering habitat protection is the crux of the issues before the Court and the condition the amendment seeks relief from, and there is a clear objective within the applicable Town Plan to

---

[6] The Court notes that the Costco decision is presently pending on appeal before the Vermont Supreme Court. The decision's rationale, however, as it relates to subsection (c) remains relevant.

protect deer wintering habitat, this factor must weigh in favor of finality despite the provisions related to home businesses.[7]

**(e) Manifest error on the part of the District Commission, the environmental board, of the environmental court in the issuance of the permit condition.**

No party asserts that manifest error occurred in the issuance of LUP #5W0914 or any permit condition therein. Thus, this factor weighs in favor of finality.

**(f) The degree of reliance on prior permit conditions or material representations or the applicant in prior proceeding(s) by any party, the District Commission, the environmental board, the environmental court, or any other person who has a particularized interested protected by 10 V.S.A. Ch. 151 that may be affected by the proposed amendment.**

With respect to the NRB and the District Commission, Condition 12 was essential to the issuance of LUP #5W0914. The record of LUP #5W0914 reflects that the District Commission relied upon representations made in the subdivision application and that those representations, which culminated in Condition 12 and related documents, which were "integral" to the District Commission's conclusions with respect to Criterion 8 and 9(C). The record reflects significant reliance by the District Commission in this circumstance.

Further, Neighbors have provided affidavits that they purchased their properties specifically in reliance on the wildlife protections set forth in LUP #5W0914. Applicant does not contest these assertions.

The reliance by the District Commission and Neighbors is reasonable and weighs strongly in favor of finality. See Stowe Club Highlands, 166 Vt. at 40 ("The reasonable reliance of the District Commission and the neighboring landowners weighs strongly against granting a permit amendment.").[8] Further Applicant does not address this factor and presents no assertion that it weighs in favor of flexibility. It is her burden to prove that factors weigh in favor of flexibility. Re: Dr. Anthony Lapinsky & Dr. Colleen Smith, Nos. 5L1018-4, 5L0426-9-EB, Findings of Fact, Conclusions of Law, and Order, at 14 (Vt. Envtl. Div. Oct. 3, 2003). Thus, this factor weighs in favor of finality.

**(g) Whether the applicant is merely seeking to relitigate the permit condition or to undermine its purpose and intent.**

The Project seeks to undermine the intent of Condition 12's purpose. Condition 12 and its related documents and limitations were imposed to preserve and limit impacts on deer wintering areas

---

[7] Even giving equal weight to the competing provisions within the Town Plan, this factor would, at best, weigh neutrally.

[8] It is for this reason and due to the fact that Applicant has failed to address this factor that the Court need not address the NRB's arguments that ANR and the Town of Roxbury also relied upon LUP #5W0914.

13

around the subdivision and on the Property. This includes impacts from domestic dogs. See NRB Ex. 9 (LUP#5w0914 proposed deed restrictions including that "[a]ll dogs must be confined or leashed."). The Project seeks relief from aspects of this condition to allow for greater than contemplated impacts on the preserved habitat. Applicant asserts that she does not seek to relitigate Condition 12,[9] but that assertion is without support and ignores the fact that the Project undermines Condition 12 and the wildlife protections of LUP #5W0914. Thus, this factor weighs in favor of finality.

Having reviewed all relevant factors, the Court finds that the material facts are not in dispute such that no factor weighs in favor of flexibility and, as such, Applicant is not entitled to seek amendment of LUP #5W0914. For this reason, Applicant's motion is **DENIED** and the NRB and Neighbors' motions are **GRANTED**.

### Conclusion

For the foregoing reasons, the Court concludes that the material facts are not in dispute and the NRB and Neighbors are entitled to judgment as a matter of law and their motions are **GRANTED**. Conversely, Applicant is not entitled to judgment as a matter of law and her motion is **DENIED**. Having concluded that Applicant is not entitled to seek amendment of LUP #5W0914, all other issues before the Court are **MOOT**.

This concludes the matter before the Court. A Judgment Order accompanies this Decision. Electronically signed this 2nd day of October 2024 pursuant to V.R.E.F. 9(D).

Thomas G. Walsh, Judge
Superior Court, Environmental Division

---

[9] This appears to in part be due to her assertion that she is "in compliance" with its terms. For the reasons set forth above, the Court disagrees.